UNION CITY LUMBER CO. v. TRAVERSE CITY, LEELANAU
& MANISTIQUE RAILROAD CO.

1. CREDITORS' SUITS—STOCKHOLDERS' LIABILITY—CORPORATIONS—
BONUS STOCK.

The issuance of fully paid, nonassessable stock by a corporation
as a bonus to purchasers of its bond issue and to promoters
of the corporation, is fraudulent and void under 3 Comp.
Laws, §§ 6231, 6234, as against rights of creditors.

2. SAME — SUBSCRIBER TO CORPORATE STOCK — JUDGMENT CRED-
ITORS' BILL—EQUITY.

And in a suit to enforce stockholders' liability, persons who
have accepted stock without paying for it stand in the posi-
tion of subscribers.

3. SAME.

After so agreeing, their refusal to accept the certificates of
stock would not cancel their liability to such creditor.
BIRD, J., dissenting.

4. SAME—NOTICE OR KNOWLEDGE OF CREDITORS.

That complainant, at the time his indebtedness was incurred,
knew nothing of defendants' agreements with the corpora-
tion, would not constitute a defense.

5. SAME — CORPORATIONS — STOCK — FULLY PAID SHARES — GOOD
FAITH.

Stock issued to contractors who have received the full value of
their work performed in constructing the railroad, and who
paid nothing therefor, cannot be held to have been received
in good faith as fully paid.

6. SAME—PARTIES—DEMURRER—WAIVER.

The objection that certain stockholders were not named as
parties defendant by complainant's bill was not ground for
dismissal, in the absence of any demurrer or objection on that
ground, where the impracticability of making such stock-
holders parties appeared at the hearing, although the bill
omitted to aver that it was impracticable to join them as
defendants.

Appeal from Kent; McDonald, J. Submitted June 29,
1910. (Docket No. 126.) Decided May 31, 1912.

Bill by the Union City Lumber Company against the Traverse City, Leelanau & Manistique Railroad Company and others for the enforcement of liability of certain stockholders. From a decree in favor of part of defendants, complainant appeals. Modified and affirmed.

*Thomas P. Bradfield,* for appellant.

*Campbell, Bulkley & Ledyard,* for appellee Union Trust Co.

*James H. Campbell,* for Grand Rapids & Indiana Railway Co.

OSTRANDER, J. In addition to the facts stated in the opinion of Mr. Justice BIRD, I think the following should also be stated: Metheany and Kaufman, the promoters of the Traverse City, Leelanau & Manistique Railroad Company, in their scheme for financing the proposed road, arranged with the defendant Union Trust Company for the sale of its bonds. As appears by the correspondence, the letter of the defendant Union Trust Company of November 19, 1901, was addressed to these gentlemen, is in reply to theirs of November 15th, refers to the underwriting of $300,000 of 5 per cent. gold bonds of the proposed company, the terms of which are described, and contains the following:

" The bonds to be coupon bonds and the underwriting to be at ninety cents on the dollar; one-half of which underwriting, viz., one hundred and fifty thousand dollars ($150,000) you agree to subscribe for and obtain subscriptions for, at the same price, viz., ninety cents on the dollar, the Union Trust Company to be paid a bonus for such underwriting of thirty thousand dollars ($30,000) of the par value of the stock in the proposed Traverse City, Leelanau & Manistique Railroad, fully paid and nonassessable; * * * the bonus stock to be delivered to the Union Trust Company when the other stock is delivered to the other stockholders, and to be received and held by it under the terms of your said letter of November 15, 1901, for a period of two years from the date of its delivery."

To this letter Metheany and Kaufman replied, acknowledging the receipt thereof, and stating:

"The same is satisfactory to us, and is hereby accepted."

The Traverse City, Leelanau & Manistique Railroad Company filed its articles of incorporation November 25, 1901. Of an authorized capital of $500,000, $15,000 was subscribed in the articles of association. The articles showed $500 per mile subscribed and that 5 per cent. of the amount subscribed had been paid in to the directors in good faith in cash by the subscribers. 2 Comp. Laws, § 6223. The railroad was constructed. During the period from April to October, 1903, the complainant furnished certain material used in the construction of the road, for the value of which its judgment was taken. No report was ever filed by the railroad company or by its officers until 1907. The complainant was unable to secure the production in court of the books of the defendant railroad company, and there is before the court no record of the company showing the issue of any stock to any person. It appears from the testimony that a certificate or certificates of stock were issued and tendered to the Grand Rapids & Indiana Railway Company, to whom Metheany and Kaufman had made a sale of some of its bonds, and that the tender was refused. It also appears that, shortly before the bill in this cause was filed, a certificate for stock of the Traverse City, Leelanau & Manistique Railroad Company, numbered 2, for 300 shares, was issued to the defendant Union Trust Company, under date March 23, 1904, in which certificate it is stated that "Union Trust Company is the owner of three hundred shares of the full paid capital stock of" said company. The testimony shows that this certificate was received by the Union Trust Company April 8, 1904.

On the 2d of June following, the Union Trust Company wrote to Mr. Metheany, addressed as president of the defendant railroad company, a letter as follows:

"A question has been raised whether the stock of the Traverse City, Leelanau & Manistique Railroad Company has been fully paid.; it being claimed that the stockholders must contribute to pay obligations of the company.

"The stock fee which the Union Trust Company was to be paid for financing your road was a stock that was fully paid and nonassessable. Is that true of the stock issued for that purpose? If it is not, I cannot accept, on behalf of the Trust Company, the stock which has already been issued."

In reply, Mr. Metheany, adding to his signature the abbreviation "Pres.," wrote:

"I have your letter of June 3d, on the subject of the capital stock of the Traverse City, Leelanau & Manistique Railroad Company. The stock was issued to MacDonald Brothers & Company as part consideration under their contract for the construction of the road, and was purchased from them by Mr. Kaufman and myself. I consider the stock fully paid. If under those conditions you do not need the stock, you will please so advise me."

The Union Trust Company kept the certificate. The contract for the construction of the defendant railroad was dated July 3, 1902, the parties thereto being the railroad company and MacDonald Bros. & Co. By its terms the railroad company, in consideration of the performance by the contractors of their undertaking, agrees to pay certain specified sums and prices; for example: For clearing, at the rate of $25 per acre; for excavating, at the rate of 20 cents per cubic yard; for track laying, at the rate of $300 per mile; for ballasting, at the rate of $575 per mile. The contractor testified that the prices named in the contract for different classes of work were prices named in the bid. Written on the margin of the contract is the following paragraph in the handwriting of Mr. Metheany:

"And as a further consideration, the company agrees to issue, deliver, and turn over to the contractor all of the unsubscribed capital stock of the company, the same being ——— shares of the par value of one hundred dollars each."

The paragraph continues:

" Which said prices and capital stock [the words ' and capital stock ' being inserted] shall be in full consideration for all labor and material."

The testimony of Archibald MacDonald, one of the contractors, is that he has no recollection that any certificate of stock was ever issued to him or in his name, no certificate ever came into his possession, and he never considered the capital stock of the road as of any value. The following questions and answers are.a part of his testimony, on cross-examination:

"*Q*. And you never indorsed any certificate of stock?
"*A*. I would not say that.
"*Q*. Well, if the stock was not issued in your name, what occasion would there be for indorsing it?
"*A*. I understand that Mr. Kaufman had presented one paper for me to sign one time up the road; I have no recollection of it, but, if he asked me to sign a certificate over, I no doubt did, for I thought—
"*Q*. If you signed over a certificate, then the certificate must have been issued in your name?
"*A*. It never came into my possession, and I do not remember anything about it.
"*Q*. That was not the question which I asked you. I asked you whether you ever had knowledge of a certificate of stock which was issued in your name?
"*A*. No, sir.
"*Q*. And which you assigned over to some one else?
"*A*. I have not."

The mortgage executed to secure the bonds ran to the Union Trust Company, trustee. Later an amended mortgage was executed dated March 30, 1903. The Union Trust Company sold all the bonds at par prior to September 17, 1902, excepting $75,000 which the defendant Grand Rapids & Indiana Railroad Company agreed to and did take and issued interim certificates for the bonds containing the provision that, if the road was not completed at a certain date, the Union Trust Company would buy back the bonds. It did take back the interim certifi-

170 MICH.—14.

cates from all the holders excepting the $75,000 subscribed by the Grand Rapids & Indiana Railway Company. It does not appear whether the trust company ever sold the bonds to any one else or issued them again or whether it resold them to the same people. It is not claimed that the complainant knew at the time it sold the materials to the defendant railroad company what the capital stock of the railroad company was, what amount purported to have been paid thereon, or who the stockholders were or were purported to be.

With respect to the defendant Grand Rapids & Indiana Railway Company, it appears that it subscribed for and paid for $75,000 of the bonds at par some time before May 21, 1902. On April 22, 1902, the directors of that company passed a resolution reading as follows:

"Whereas, the general manager of this company has submitted a communication together with a contract between the Traverse City, Leelanau & Manistique Railroad Company and this company, providing for the subscription by this company to the bonds of the Traverse City, Leelanau & Manistique Railroad Company to the extent of $75,000 and the operation of said road when completed; and whereas, a full discussion of the subject, and the testimony of the operating and traffic officers of this company has developed two facts, to wit: *First*, that the establishment of a car ferry line between Northport and Manistique will not deprive the Grand Rapids road of as much business via Mackinaw as will probably be developed and secured to this company by the establishment of the car ferry; and, *second*, that if the Grand Rapids railroad does not take the proposed interest and make the contract with the Traverse City, Leelanau & Manistique Railroad Company, the Pere Marquette Railroad Company will take its place in making such contract and taking such interest; therefore, resolved, that the proper officers of this company are authorized to make a subscription in the sum of $75,000 to the bonds of the Traverse City, Leelanau & Manistique Railroad Company, and to enter into the contract as submitted for the operation of said Leelanau railroad; provided, *first*, that with the bonds they shall receive $125,000 worth of the capital stock of the Leelanau company, and *second*, that an agreement shall

be made between the Leelanau company and the Manistique, Marquette & Northern Railroad Company by which the latter company will agree to maintain a good and satisfactory ferry service between Northport and Manistique, and not transfer the same without the consent of the Leelanau company to some other port."

It has already been stated that the capital stock of the defendant Traverse City, Leelanau & Manistique Railroad Company, mentioned in this resolution, was issued and tendered to and refused by the Grand Rapids & Indiana Railway Company. It is the contention of complainant that the Grand Rapids & Indiana Railway Company became entitled to 1,250 shares of the capital stock of the Traverse City, Leelanau & Manistique Railroad Company as soon as it paid for its bonds, which was in June, 1902, and that the Union Trust Company became entitled to 300 shares of such stock when it performed its agreement and as early as September, 1902; that therefore, upon the respective dates, they became holders of stock upon which nothing had been paid, and for the par value of which they were liable to existing and subsequent creditors of the road.

On the other hand, and upon the merits, the defendant the Grand Rapids & Indiana Railway Company insists that it is not proved either (*a*) that it subscribed for, or (*b*) that it ever became owner or holder of any of the said capital stock.

The defendant Union Trust Company upon the merits contends (*a*) that it was not a subscriber to the capital stock; (*b*) that it purchased the stock in good faith from Metheany and Kaufman, who had acquired it from the corporation through the contractors who built the road; (*c*) that the stock was issued to it as compensation for services rendered, and, in the absence of fraud or proof that the consideration was grossly inadequate, the transaction is not open to question; (*d*) that it became holder and owner of stock after the debt of complainant accrued. Some circumstances and conclusions applicable

alike to the contentions of each of these defendants may first be considered.

The statute provides that stock shall be transferable in the manner and under restrictions and conditions provided for in the by-laws—

" But any certificate of stock issued before payment in full, shall show on its face, or by indorsement, the amount paid thereon, and no share shall be transferred on the books of the company until the same shall be paid in full, without the consent of the board of directors." 2 Comp. Laws, § 6231.

The statute further provides:

"That it shall not be lawful for any railroad company existing by virtue of any of the laws of this State, nor for any officer of any such company, to sell, dispose of, or pledge any shares in the capital stock of such company, nor to issue certificates of shares in the capital stock of such company until the shares so sold, disposed of, or pledged, and the shares for which such certificates are to be issued shall have been fully paid, nor issue any stock or bonds except for money, labor or property actually received, and applied to the purpose for which such corporation was created; and all fictitious stock dividends and other fictitious increase of the capital stock or indebtedness of any such corporation shall be void; and if any officer or officers of any such company shall issue, sell, pledge, or dispose of any shares or certificates of shares of the capital stock of such company, in violation of the provisions of this act, such officer or officers so doing shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished as provided by law in case of issuing false or fraudulent railroad stocks. The provisions of this act shall apply as fully to the stocks and officers of consolidated railroad companies, as existing in whole or in part within this State, as to original unconsolidated companies existing as aforesaid." 2 Comp. Laws, § 6344.

It is the duty of every railroad company to file with the secretary of State in July of each year a special report and statement, sworn to by the president and secretary, setting forth the number of shares of capital stock actually

issued, sold, pledged, or disposed of by the company to the date of such report.

Assuming that all the stock not originally subscribed for was formally issued in the name of the contractors, or of one of them, it is not pretended that it was earned by them. It is idle to say that, in addition to the contract prices specified for work, either party to the agreement for construction of the road intended, in good faith, that the construction should also pay the par value of the shares of capital stock. The subterfuge of issuing the stock to the construction contractor has before now been found to be convenient, as is matter of common knowledge. The stock referred to in resolutions of the Grand Rapids & Indiana Railway Company and in the agreement made by the promoters and the Union Trust Company was not stock for which some one was first to pay value to the proposed company. No one, however credulous, can believe that. It must therefore be considered that, with respect to both the defendants concerned in this appeal, it was understood that when the promoted corporation was organized some of its capital stock should be issued to each of them. The right to the stock was in one case dependent upon an underwriting and sale of bonds of the promoted corporation, in the other case upon the fact of taking and paying for certain of its bonds. Each performed the stipulated condition. The stock was tendered to each of them. One received it; the other refused it. Some of the facts may be referred to more in detail. The proposition of the Union Trust Company to underwrite $300,000 of bonds of the Traverse City, Leelanau & Manistique Railroad Company and to be paid a bonus for such underwriting of $30,000 par value of the stock of said promoted corporation contains the following:

" The bonus stock to be delivered to the Union Trust Company when the other stock is delivered to the other stockholders, and to be received and held by it under the terms of your said letter of November 15, 1901, for a period of two years from the date of its delivery."

In the same communication—proposition—it is provided that, if the avails of the bonds at 90 cents on the dollar shall produce more than enough to build the railroad, the excess shall be covered into the treasury of the railroad company, and, if not sufficient, the promoters and their associates shall supply the deficit.

It is further made a condition that an operating agreement shall be entered into between the proposed corporation and the Grand Rapids & Indiana Railway Company substantially as outlined in the said letter of November 15, 1901:

" To me as secretary and treasurer of the Union Trust Company, and signed by R. R. Metheany, secretary and auditor, and a copy thereof furnished to the Union Trust Company, before any money, under the terms of this underwriting, shall become due and payable."

The letter of November 15, 1901, referred to, does not appear to have been produced at the hearing. The letter which I have quoted from is signed by the secretary of the Union Trust Company. Metheany was secretary and auditor of the Grand Rapids & Indiana Railway Company. The action of the directors of the Grand Rapids & Indiana Railway Company, hereinbefore set out, is in entire agreement with the understanding arrived at between the Union Trust Company and the promoters of the Traverse City, Leelanau & Manistique Railroad Company. The plan of the promoters is not obscure. It is obvious. They proposed to build a railroad, paying for construction out of the proceeds of bonds to be issued and sold. Prudently, they sought in advance to find a market for the bonds and did find one. For the purposes of promotion, they intended to use the stock of the corporation when it was formed as if it was their own, and they contracted to issue some of it in aid of the general purpose. Both contesting defendants were cognizant of, and, so far as they acted at all, they approved of, the plan. For all practical purposes, therefore, the arrangements made by the promoters with the contesting defendants

amounted to a subscription by those defendants to the capital stock of the proposed corporation, being in effect an arrangement for the disposition of $155,000 par value thereof. In other words, each of the contesting defendants, as a condition to furnishing aid to the proposed corporation, required that some of the capital stock of the corporation be turned over to it. When the corporation was organized, it ratified the arrangement made with the promoters, accepted the benefits secured thereby, and tendered performance on its part. I cannot find that the Union Trust Company and the promoters of the new corporation agreed, or intended to agree, or ever contemplated, that by its services to be rendered, the Union Trust Company would earn $30,000 par value of the capital stock of the corporation. No such claim is advanced in the answer of the Union Trust Company to the bill of complaint. No such claim is supported by testimony. Both contesting defendants, so far as the original arrangements for stock are concerned, stand alike.

It was said by this court in *Peninsular Sav. Bank* v. *Stove Polish Co.*, 105 Mich. 535, 538, 539 (63 N. W. 514, 515):

"The policy of the law, therefore, requires the utmost good faith on the part of stockholders in the payment of their stock. Any attempt to evade this liability either by issuing stock as fully paid when it is not, or by putting in property at a value grossly in excess of its real value, or by gift, or by services, or by an agreement to render services, grossly incommensurate with their value, is void as to the public and creditors."

The Traverse City, Leelanau & Manistique Railroad Company, the Grand Rapids & Indiana Railway Company, and the Union Trust Company were parties to an arrangement which was not only opposed to the general policy of the law, but was in direct contravention of the statute and fraudulent because forbidden. It does not follow, however, that, because it was proposed to receive stock issued in contravention of the statute, the contest-

ing defendants may not be held to be subscribers to stock at the suit of creditors of the corporation.

It is, for example, a rule of general application that in equity, as against creditors of a corporation, the acceptance of stock, without paying for it, places the acceptor in the position of a subscriber. *Handley* v *Stutz*, 139 U. S. 417 (11 Sup. Ct. 530), cited with approval in *See, Receiver*, v. *Heppenheimer*, 69 N. J. Eq. 36, 79 (61 Atl. 843).

It has been held, too, and I think the holding should be approved by this court, that persons subscribing to an issue of the bonds of a corporation upon the condition that shares of capital stock of the corporation, equal in par value to the value of the bonds subscribed for, shall be given with the bonds, become subscribers to the capital stock, entitled to the shares when the bonds are paid for, and liable to creditors of the corporation as holders of unpaid stock. *Gillett* v. *Trust Co.*, 230 Ill. 373 (82 N. E. 891). In that case it appeared that the subscriptions, in terms, were for bonds. The provision of the subscription paper relating to stock, and the only reference to stock contained therein, was:

" Before any subscription shall be binding there shall be deposited with the American Trust & Savings Bank, as trustee, $800,000 of the capital stock of the Columbian Celebration Company, full paid and nonassessable, said stock to be held by said trustee to be delivered to the subscribers to said bonds, as follows: Each subscriber, on the full and final payment to the aforesaid trustee of the amount subscribed for by him according to the terms of his subscription, shall be entitled to receive, and the said trustee shall deliver to said subscriber, the number of bonds subscribed and paid for by him, and in addition thereto an amount of the capital stock of the Columbian Celebration Company equal, at its par value, to the par value of the bonds subscribed and fully paid for by such subscriber."

It seems that the stock referred to had been put back into the treasury of the company by one to whom it had

been issued, but who had in fact not given value for it as required by the law of the State. It was held, answering the argument that money paid for bonds ought to be treated as paid for stock, that all parties to the transaction looked upon the stock which accompanied the bonds of each subscriber as a bonus. It appeared that some of the subscribers refused and neglected to accept the shares of bonus stock. It is said in the opinion:

" It has also been suggested on behalf of those who did not take actual physical possession of the stock certificates that if nothing was paid for the stock it was optional with the subscribers to take the stock or leave it when they paid for the bonds. A careful reading of the subscription agreement * * * shows that the subscribers were under precisely the same obligation to receive the stock that they were to accept the bonds. If, as between themselves and the corporation, they had the right to decline to take certificates of stock for which they had paid nothing, they had no such right as to creditors. When they became the owners of the stock, though they acquired it without paying anything therefor, they incurred a contingent liability to creditors which was not to be avoided by refusing to receive the certificates."

And again:

" Under the subscription agreement, when the necessary $500,000 was subscribed and payment was made by any subscriber he became the owner of the stock which was to accompany his bonds. Whether or not he obtained the certificate or left it with the trustee is a matter of entire indifference. It was by virtue of the subscription contract that he became the owner of the stock. Whether he actually received the certificate is immaterial." *Id.* p. 413.

So I think it is immaterial here whether the Grand Rapids & Indiana Railway Company accepted, or did not accept, the bonus stock which it had demanded and which was tendered to it. Both it and the Union Trust Company had by the terms of the agreements they made become entitled to the stock before the complainant's debt accrued.

It is true complainant was not informed and did not rely specifically upon either subscription to stock. But it

extended credit to the Traverse City, Leelanau & Manistique Railroad Company, which company recognized the contesting defendants as entitled to own and hold $155,000 par value of its capital stock. It does no violence to settled rules or to equitable principles to permit the complainant creditor to regard them precisely as they had arranged to be regarded, namely, as having contracted to have and receive certain shares of the capital stock to be issued by the corporation debtor as a part of its original, authorized capital and to disregard, as not binding upon creditors, the stipulation that nothing should be paid for the stock. Stockholders of a corporation are permitted to escape the consequences of corporate failure beyond the sum invested or agreed to be invested in its stock, and to have a proportional share in corporate success. As against those who furnish the corporation with property necessary to carry on its business, no one who has stipulated for what has been called a "ground floor" interest in the corporation, who holds, or is entitled by the stipulation to hold and own, any part of the original issue of capital stock, ought to be permitted at his pleasure, and as his interest seems to demand, to repudiate or profit by the stipulation. That his position is concealed from creditors ought not to aid him. In my opinion, both the Grand Rapids & Indiana Railway Company and the Union Trust Company should be held to be liable to pay complainant upon the ground that they were as to creditors original subscribers to the capital of the debtor corporation. The Union Trust Company should be held liable upon the further ground that it accepted unpaid for shares of stock pursuant to an arrangement which matured before complainant's debt was contracted.

It is urged as a reason for refusing relief that the bill is defective because all the stockholders are not made parties and no sufficient excuse is made for not bringing them upon the record. *Dunston* v. *Hoptonic Co.*, 83 Mich. 372 (47 N. W. 322), Thompson on Liability of Stockholders, § 353, 3 Clark & Marshall on Private Cor-

porations, p. 2461, are cited and relied upon. The particular default mentioned in the brief is that Daniel W. Kaufman, one of the original subscribers to the capital stock, was made a party to the bill and afterwards, without a showing that he was beyond the jurisdiction of the court, was dismissed. It is contended, further, that the testimony shows that this defendant was in fact a resident of Detroit for at least two years prior to the hearing. It is also urged that the record affords no information as to the personnel and number of stockholders other than the original subscribers, nor information as to when and to what amount stock was issued to Metheany and Kaufman.

It appears that the bill of complaint was filed April 20, 1904. Complainant's judgment was rendered February 15, 1904, for indebtedness accruing between April 21, 1903, and September 25, 1903. Execution was issued against the judgment debtor and returned unsatisfied. The subscribers to stock upon the articles of association were made parties defendant, as well as the contesting defendants. It has been heretofore stated that no report of the corporation was made until the year 1907. None of the defendants who answered intimated that there were stockholders not brought upon the record. The books of the Traverse City, Leelanau & Manistique Railroad Company and certain papers were, upon the petition of complainant, ordered to be produced, including the book, papers, and record showing the amount paid for stock in such corporation by the several stockholders prior to September 24, 1903. They were not produced. Interrogatories to be answered by defendant Richard R. Metheany were filed. This man was one of the promoters hereinbefore referred to and was afterwards president of the above-named corporation.

One of the interrogatories was:

"Referring to the books and papers which the defendant Traverse City, Leelanau & Manistique Railroad Company were asked to produce in a petition filed November

1, 1904, where were said books and papers November 1, 1904?"

The answer was:

"In answer to interrogatory 3 this defendant says that he does not know where the books and papers which the Traverse City, Leelanau & Manistique Railroad Company were asked to produce in court were on the 1st day of November, 1904, but believes that they were in the hands of Daniel W. Kaufman, the treasurer and vice president of said railroad company at that time, and the said D. W. Kaufman was at that time living in Chicago, Ill."

In answer to interrogatory 10, the answer was:

"This defendant in answer to interrogatory 10 says that all of the books and papers of the Traverse City, Leelanau & Manistique Railroad Company were in the possession of said railroad company at the city of Grand Rapids, Mich., in the spring of 1903, and during that spring and summer the officers of said railroad company were removed to Manistique, Mich., and all of the books and papers of said railroad company were removed to Manistique, Mich., at that time, and since the removal of said books and papers from the offices at Grand Rapids, Mich., to Manistique, Mich., this defendant never saw the books and papers referred to in interrogatory 3, or any of them; that D. W. Kaufman, the vice president and treasurer of said Traverse City, Leelanau & Manistique Railroad Company removed from Manistique, Mich., to Chicago, Ill., in the fall of 1903, and this defendant believes that the books and papers referred to in interrogatory 3 were taken to Chicago by said D. W. Kaufman at the time he removed to the city of Chicago, where he still resides."

In answer to interrogatories 15 and 16, the answers were:

"This defendant in answer to interrogatory 15 says that D. W. Kaufman has been in the State of Michigan but once to defendant's knowledge since November 1, 1904, at which time he was in the city of Grand Rapids in the spring of 1905 for part of a day, and this defendant saw him a short time then.

"This defendant in answer to interrogatory 16 says that D. W. Kaufman has been in Grand Rapids and Kent county but once since November 1, 1904, to defendant's

knowledge, and that was the same time as set forth in the preceding answer."

It appears further that originally a subpœna and an alias subpœna were issued for the appearance of Daniel W. Kaufman, and were each of them returned not served because Kaufman could not be found. It further appears that this cause came on for hearing June 22, 1908, and that during the hearing a colloquy occurred between counsel as to whether Daniel W. Kaufman was a party to the suit. Counsel for complainant said:

" I might state that I discovered, I think Thursday, that Mr. Kaufman was in the State. He was formerly a party and after a number of aliases were issued, as the records will show, we failed to get service on him, and the suit was dismissed as to him. On Thursday I found him in the State and issued a subpœna to Mr. Kaufman, which I will have marked and offered in evidence, together with the proof of the constable's inability to find him, attached."

He then introduced a *subpœna duces tecum* and return of an officer, made June 20, 1908, certifying that he tried to serve the subpœna of June 19, 1908, on Kaufman in Detroit, but was unable to find him either at his office or his house.

In the bill of complaint it is prayed that the defendant Traverse City, Leelanau & Manistique Railroad Company, as a part of its answer, be required to disclose the names and residences of all persons or corporations to whom any of the capital stock of said company was issued prior to September 25, 1903, and the amount actually received by said company from said persons and each of them. This defendant did not file an answer. I do not find in the record evidence of any objection based upon a want of proper parties.

The rule announced in *Dunston* v. *Hoptonic Co.*, 83 Mich. 372 (47 N. W. 322), a cause decided upon demurrer to the bill, was stated in *Adler* v. *Manufacturing Co.*, 13 Wis. 57, as follows:

"The authorities show that in such actions, unless it be impossible or impracticable, all the stockholders must be made parties. This is required in order to enable the court to do complete justice between the stockholders themselves, and so that no one of them may be compelled to pay more than his due proportion, and that all alike may be obliged, according to the number of their respective shares and their pecuniary ability, to contribute toward the losses which the company may have sustained: For it would be manifestly wrong and unjust to allow the creditors to select one or more of the stockholders and compel them to submit to burdens from which the other shareholders, though equally bound, are exonerated. Hence the shareholding defendants have the right, unless some good reason for the omission be shown, to insist on all the other shareholders being parties also."

I have no disposition to change it. But I hold that while the bill in this cause should have charged the impracticability of naming all shareholders, and did not do so, such impracticability was made to appear, and, there having been no demurrer interposed, the bill will not be dismissed in this court for want of proper allegations in this behalf.

The decree of the circuit court will be modified in accordance with this opinion, and, as modified, affirmed, with costs of both courts to complainant.

MOORE, C. J., and STEERE, MCALVAY, BROOKE, BLAIR, and STONE, JJ., concurred with OSTRANDER, J.

BIRD, J. The complainant, being a judgment creditor of the Traverse City, Leelanau & Manistique Railroad Company, and being unable to collect its judgment, filed its bill of complaint to enforce it against certain of its stockholders on the theory that they had not paid in full for the stock which they held. This railroad was incorporated under the Michigan laws in November, 1901, with a capital stock of $500,000, for the purpose of constructing a line of railway from Traverse City to Northport in this State. The road was graded in 1902, and the ties and rails were laid in 1903. In September, 1903, the

road became indebted to complainant for ties. The project was not a success and, the company failing to make payment for the ties, complainant sued and recovered a judgment against it for $1,408.67. After a hearing, the trial court gave complainant a decree against the original incorporators (save one upon whom service of process was not obtained) who subscribed for $15,000 of capital stock, but denied complainant relief against the Grand Rapids & Indiana Railway Company and the Union Trust Company. The question submitted to this court is whether these two defendants should also be held liable.

Was the Grand Rapids & Indiana Railway Company an owner of stock prior to September, 1903? The claim of the complainant is that, prior to the time its debt was incurred, the Grand Rapids & Indiana Railway Company was the holder and owner of $125,000 of the par value of said stock for which it had paid no value. To support this contention complainant offered in evidence a resolution passed by the board of directors of that company, the material part of which is as follows:

"Resolved that the proper officers of this company are authorized to make a subscription in the sum of $75,000 to the bonds of the Traverse City, Leelanau & Manistique Railroad Company, and to enter into the contract as submitted for the operation of said Leelanau Railroad; provided, first, that with the bonds they shall receive $125,000 worth of the capital stock of the Leelanau Company."

This was followed by a showing that the Grand Rapids & Indiana Railway Company subscribed and paid for the $75,000 in bonds. This was substantially all the material testimony complainant offered as to the ownership of the stock by the railroad. The Grand Rapids & Indiana Railroad Company, through its general manager, Mr. Hughart, conceded that the resolution was passed and that the company purchased the bonds and admitted that the stock was tendered to him, but that he declined to accept it, and that the company was never the owner of any stock prior to the time complainant's debt was incurred.

The resolution of the board, being followed by a purchase of the bonds by its officers, carries with it a very strong inference that the balance of the resolution was also carried out and the stock received, but, in the face of positive testimony that the stock was neither accepted nor received by the company, we are of the opinion that the trial court came to the right conclusion concerning it.

Was the Union Trust Company a stockholder prior to September, 1903 ? It appears that, just prior to and while the incorporation of the company was in contemplation, R. R. Metheany and D. W. Kaufman (who were elected president, and vice president and treasurer, respectively, upon its incorporation) made an arrangement with the Union Trust Company to act as trustee in a mortgage to be placed upon the railway, securing the payment of $300,000 in bonds of the company, and to underwrite them at 90 cents on the dollar, on condition that the officers of the railway company would subscribe for one-half of them at the same price. A further consideration was agreed upon to cover the cost of the bonds and the payment and cancellation of interest coupons. To this was added the following paragraph:

"The Union Trust Company to be paid a bonus for such underwriting of $30,000 of the par value of the stock in the proposed Traverse City, Leelanau & Manistique Railroad, full paid and nonassessable, the capitalization of said company not to exceed $500,000, the bonus stock to be delivered to the Union Trust Company when the other stock is delivered to the other stockholders. * * *"

In pursuance of this agreement, the mortgage was executed and the bonds sold. The sale of the bonds was completed in September, 1902, by the trust company, but it did not receive its certificate of stock until April, 1904. Under these facts counsel are in direct conflict over the question as to whether the trust company was a stockholder prior to the time the debt was incurred by the railway company.

The record shows that the railway became indebted to the complainant in September, 1903. The trust company finished selling the bonds in September, 1902. The trust company had then performed the services which entitled it to the stock under its contract. The stock then belonged to the trust company, but its delivery was postponed until the stock should be delivered to the other stockholders. Save for the clause with reference to delivery, it could have then enforced the delivery of the certificate. We think it must be said, under these circumstances, that the trust company became the owner of the stock and a member of the company in September, 1902, so as to make it liable as a stockholder at the suit of a creditor, notwithstanding it did not receive its certificate of stock until September, 1904. The certificate is not the stock. It is simply evidence of title to the stock. Angell & Ames on Private Corporations, § 113; 1 Cook on Stock and Stockholders, § 192; *Chaffin* v. *Cummings*, 37 Me. 83; *Burr* v. *Wilcox*, 22 N. Y. 551; *Holland* v. *Development Co.*, 65 Minn. 324 (68 N. W. 50, 60 Am. St. Rep. 480); *Hawley* v. *Upton*, 102 U. S. 314; *Mitchell* v. *Beckman*, 64 Cal. 117 (28 Pac. 110); *Corwith* v. *Culver*, 69 Ill. 502; *Kimball* v. *Davis*, 52 Mo. App. 194; 26 Am. & Eng. Enc. Law (2d Ed.), p. 1034. In Angell & Ames the doctrine is laid down that "one may have all the rights and be liable to all the duties of a member without a certificate." In *Chaffin* v. *Cummings*, in passing upon a like question, the court said in part:

"Nor is it necessary that certificates should have been issued. These only constitute proof of property, which may exist without them. When the corporation has agreed that a person shall be entitled to a certain number of shares in its capital, to be paid for in a manner agreed upon, and that person has agreed to take and pay for them accordingly, he becomes their owner by a valid contract, made upon a valuable consideration."

By the terms of the contract, the trust company was to receive 300 shares of bonus stock. It performed the ser-

170 MICH.—15.

vices contracted for. It accepted the stock and has since retained it, and, so far as the record shows, it has made no effort to rescind that part of the contract, nor has it asked to have the stock canceled on the ground of misrepresentation or fraud. Under all of the authorities, these facts would constitute the trust company a stockholder. It is insisted upon behalf of the trust company that the stock was issued to it for services rendered, and, in the absence of fraud and of any showing that the consideration was grossly inadequate, the transaction is not open to question.

The record shows that the trust company received a fair and probably the usual compensation for such services. It received $1 for each bond issued to cover the cost and an agreed consideration for paying, canceling, and returning the paid coupons to the company. It bought the bonds at 90 per cent. of their face value and sold them at par, thereby making a profit of $15,000 on the deal. The contract does not deal with the stock as a part of the real consideration for performing the services but as a bonus—a something in addition to what is ordinarily received. The stock of the railway company belonged to the company, and the president and treasurer had no right, as against creditors, to give it away as a bonus.

It is further argued, on behalf of the trust company, that it was not a subscriber to the capital stock of the corporation, but purchased it in good faith from the president and treasurer, who had acquired the stock from the corporation. This claim is based in part upon the following correspondence:

"June 2, 1904.
" Mr. R. R. METHEANY,
        "President Traverse City, Leelanau & Manistique
            Railroad Co.,
                "Grand Rapids, Michigan.
" My Dear Mr. Metheany:
    " A question has been raised whether the stock of the Traverse City, Leelanau & Manistique Railroad Company

has been fully paid—it being claimed that the stockholders must contribute to pay obligations of the company.

"The stock fee which the Union Trust Company was to be paid for financing your road, was a stock that was fully paid and nonassessable. Is that true of the stock issued for that purpose? If it is not, I cannot accept, on behalf of the trust company, the stock which has already been issued.

"Please reply to this letter.

"Very truly yours,
[Signed]       "ELLWOOD T. HANCE,
                    "First Vice President."

"TRAVERSE CITY, LEELANAU & MANISTIQUE RAILROAD CO.,
                 "OFFICE OF PRESIDENT,
                 "GRAND RAPIDS, MICH., June 6, 1904.
"Mr. ELLWOOD T. HANCE,
    "Vice President Union Trust Co.,
                    "Detroit, Michigan.
"*Dear Sir.*

"I have your letter of June 3d, on the subject of the capital stock of the Traverse City, Leelanau & Manistique Railroad Company. The stock was issued to MacDonald Brothers & Company as part consideration under their contract for the construction of the road, and was purchased from them by Mr. Kaufman and myself. I consider the stock fully paid. If under those conditions you do not need the stock, will you please so advise me.

"Yours truly,
"R. R. METHEANY, Pres."

The contract to render the services was made on behalf of the company. The services were rendered for the company and not for its officers, and the certificate of stock which the trust company received was delivered to it in pursuance of its contract, and it is not claimed by the trust company that it ever paid anything for the stock to either the railroad company or to Metheany and Kaufman except as it was a part of the consideration for its services performed for the railroad company, and there was no competent proof that either Metheany or Kaufman paid anything for the stock. And even if the officers of the railway did agree with the trust company that the

stock was fully paid, if as a matter of fact it was not fully paid, such an agreement would be no defense to the trust company in an action like the present one. *Ogilvie* v. *Insurance Co.*, 22 How. (U. S.) 380; *Upton* v. *Tribilcock*, 91 U. S. 45.

It would be manifestly unjust to permit the trust company to retain stock for which it has paid nothing and thereby become a part owner of the railway and of the very ties furnished by complainant, and at the same time deny complainant any relief. We are of the opinion that the trust company was a stockholder at the time the ties were purchased and should be held liable therefor.

The decree made by the trial court will be reversed as to the Union Trust Company, and affirmed as to the other defendants. Complainant will recover costs of both courts.