ROBINSON *v.* ROBSON.

1. BAILMENT—CORPORATE STOCK—TITLE—EVIDENCE.

In suit by plaintiff to have himself declared owner of certain corporate stock claimed to have been loaned to real estate firm for use as collateral in securing funds for real estate venture in which plaintiff and members of the firm were interested which stock upon repayment of the loan by the firm was to be returned to plaintiff, finding of trial court that plaintiff merely agreed to permit his stock to be used as collateral for a loan and that he had not parted with the title *held,* sustained by the preponderance of the evidence.

2. BROKERS—PLEDGES—DELIVERY OF STOCK—INTERVENERS.

Broker to whom plaintiff had loaned stock for use as collateral for a loan *held*, not the agent of interveners who loaned money to the broker with which the stock was redeemed from first pledgee by the broker in view of testimony of broker and pleadings of interveners in which it is claimed interveners purchased the stock; hence delivery of stock to broker did not constitute delivery to interveners.

3. CORPORATIONS—UNIFORM STOCK TRANSFER ACT—BLANK INDORSEMENT—PASSAGE OF TITLE—DELIVERY.

A blank indorsement by owner of a stock certificate empowers the possessor thereof to pass title by delivery to a good-faith purchaser under the uniform stock transfer act (2 Comp. Laws 1929, §§ 9520, 9524).

4. SAME—STOCK—DELIVERY.

Intervening claimant who paid in advance for purchase of corporate stock not then in defendant broker's possession and which broker subsequently notified claimant by telephone had been received *held*, not entitled to such stock in suit by one in whose name they stood on corporate books and by whom it was indorsed in blank and loaned to broker for use as collateral since delivery was not effected so as to pass title under the uniform stock transfer act to good-faith purchaser (2 Comp. Laws 1929, §§ 9520, 9524).

5. SAME—STOCK—ACTUAL OR CONSTRUCTIVE DELIVERY OF CERTIFICATES.

Broker in possession of four certificates of stock of 500 shares and one certificate of 100 shares who merely handed them over to intervening claimants who had purchased from him 200 and 400 shares *held*, not thereby to have effected either actual or constructive delivery to such interveners in suit by owner, who had indorsed them in blank and given broker possession merely as a loan, to have plaintiff declared to be the owner of the stock in question (2 Comp. Laws 1929, §§ 9520, 9524).

6. SAME—EXECUTORY CONTRACT FOR SALE OF STOCK—DELIVERY— EQUITY.

Under an executory contract for the sale of stock in a certain corporation, the defendant broker could fulfill by delivery to such purchasers of any of such stock as might be purchased in the open market; hence purchasers had an adequate remedy at law against the broker for nondelivery and were not en-

titled to equitable relief with respect to particular shares of such stock of which broker had possession and which had come into his hands by virtue of a loan from owner who had indorsed it in blank and now seeks to have it declared to belong to him.

7. BAILMENT—ABANDONMENT.

Abandonment by owner of stock was not indicated by reason of the fact that he had waited 11 years before beginning suit to have himself declared owner of stock he had indorsed in blank and loaned to broker for purpose of securing a loan for his own benefit as owner always had the right to pay the loan so as to discharge the lien and redeem the stock.

8. CORPORATIONS—STOCK—LACHES—INDORSEMENT IN BLANK—DELIVERY.

Owner of corporate stock who indorsed it in blank and loaned it to a broker for use as collateral in securing a loan was the owner thereof until it was delivered to a good-faith purchaser and where broker used, money received from purchasers thereof to redeem stock from pledgee but failed to complete delivery to purchasers thereof, purchasers never acquired right thereto where owner sought decree declaring himself to be true owner thereof when broker sent stock in to corporation for transfer to his own name, notwithstanding owner had waited 11 years to start such suit, as purchasers had not relied upon owner's action or inaction (2 Comp. Laws 1929, §§ 9520, 9524).

9. COSTS—DISCRETION OF COURT—EQUITY.

Allowance of attorney fees as costs against each of three interveners claiming title to the stock, to be divided equally between owner of corporate stock, plaintiff, and corporation involved, a defendant, was within discretion of trial court (3 Comp. Laws 1929, § 15435).

Appeal from Ingham; Carr (Leland W.), J. Submitted January 15, 1941. (Docket No. 47, Calendar No. 41,428.) Decided April 8, 1941.

Bill by James H. Robinson against Don J. Robson and Nevin Sturgeon, formerly copartners doing business as Robson & Sturgeon, and the Duplex Truck Company, a corporation, for a decree declar-

ing him to be the owner of certain stocks. Cross bill by Marie Dill, Roy J. McCornac, and Rudolph Stonisch, interveners. Decree for plaintiff. Interveners appeal. Affirmed.

*Maxwell W. Benjamin,* for plaintiff.

*S. Reymont Paul,* for interveners.

McALLISTER, J. Prior to November 22, 1928, James H. Robinson, of Lansing, was the owner of five certificates of stock aggregating 2,100 shares of the Duplex Truck Company, a Michigan corporation. For a considerable period of time plaintiff had been interested in certain real-estate developments with Don J. Robson and Nevin Sturgeon, who were engaged in the real-estate business. Shortly before the above-mentioned date, plaintiff turned over to Robson & Sturgeon the said certificates of stock, indorsed in blank. The purpose for which these certificates were given and the understanding of the parties with reference thereto form one of the vital issues in this case.

Plaintiff claims that the stock was loaned to Robson & Sturgeon for the purpose of enabling them to secure a loan to be used by them as their contribution to the real-estate investment; and that the stock was thereafter to be returned to plaintiff. The interveners claim that the stock was transferred to Robson & Sturgeon in order to make a loan for the benefit of plaintiff; and that the proceeds were to be part of plaintiff's contribution to the real-estate venture. The determination of this question is important, because the controversy raises the issue of the rights of third parties, claimed to be *bona fide* purchasers; and, if plaintiff had parted with his title to the stock at the time of the transfer to Rob-

son & Sturgeon, it would affect his right to prevail in this suit, as a recital of further facts will make clear.

Whatever the purpose of the transfer, Robson used the stock to secure a loan of $3,500. To do this, he induced a stockbroker in Detroit to borrow this sum from a bank and to turn the money over to him. The way in which this money was secured is important to an understanding of the case.

The stockbroker, on November 22, 1928, gave his personal note for $3,500 to the Metropolitan Industrial Bank of Detroit. The bank, however, required that it be secured for the loan. This security took the form of a bond of indemnity, furnished to the bank by the General Casualty & Surety Company. As security for giving the bond to the bank, the surety company received the 2,100 shares of stock which plaintiff had given to Robson and Sturgeon.

On June 14, 1929, $1,400 having been paid on the note up to that time, the surety company paid the bank $2,100 and some accumulated interest on the note; and received from the bank the broker's note which it continued to hold together with the shares of stock which had been deposited to secure it for the giving of the bond of indemnity to the bank. At this time, then, the situation was that the bank had no further connection with the transaction; and the surety company held the stock and the broker's note in the amount of $2,100. Robson & Sturgeon had received the $3,500. Plaintiff had no knowledge of where the stock was; and the broker who had made the loan from the bank for the benefit of Robson and Sturgeon was still liable on his note.

While the surety company was holding the note of the broker and the stock as security, the broker became insolvent, and a receiver was appointed. Thereafter, all of the assets and liabilities of the

surety company, including the note and stock in question, were taken over by another surety company—the General Indemnity Corporation of America, a New York corporation. This latter corporation, too, afterward became insolvent and was placed in receivership, under the supervision of the insurance department of the State of New York, which came into possession of the shares of stock in question, together with the other assets of the insolvent surety company.

During all of this time the stock stood in the name of plaintiff on the books of the Duplex Truck Company. In 1937 and 1938, plaintiff became rather insistent on finding out from Sturgeon where the stock was. Sturgeon worked in Lansing, which was the home of plaintiff, and Robson lived in Detroit. Upon being repeatedly requested by plaintiff, Sturgeon on several occasions tried to find out from Robson where the stock was; and Sturgeon testified that Robson told him that it was somewhere down East, but that he did not know where, and might be able to find out later. Not being able to find out where the stock was, plaintiff, on December 22, 1938, filed an affidavit with the Duplex Truck Company, setting forth that the certificates of stock had been "lost, stolen, destroyed, or mislaid, sometime during the past six or seven years, and that despite his every effort to locate same, he is unable to find them;" and, thereafter, upon plaintiff's filing an indemnity bond in the amount of $12,000 to protect the company, the corporation issued duplicate certificates of stock to him.

On February 13, 1939, Robson began to communicate with the New York insurance department in an effort to secure the stock, and on June 7, 1939, he wrote the department a letter in which he stated, among other matters:

"I thought it would be a good thing to give you the circumstances as to how this block of stock came into your possession and possibly you could advise me as to my correct procedure.

"Early in 1929 I borrowed a small amount of money from a brokerage firm, H. S. Robinson Company, of Detroit, and gave this stock as collateral. * * *

"This stock was given me, at the time I made the loan, by a friend of mine, J. H. Robinson, no relation or connection of H. S. Robinson. We have allowed the matter to drift until now that the stock has been located. I feel that it is my place to recover it and return it to him."

Finally, after several letters and personal interviews between Robson and the officer of the New York insurance department in charge of the matter, the sum of $3,412.50 was agreed upon for the exchange of the stock to Robson, and the insurance department forwarded the stock to a Detroit bank with draft attached for the above amount, which Robson paid, receiving the stock on September 25, 1939. The certificates which Robson received were the identical certificates indorsed in blank by plaintiff which had been used by Robson to obtain the loan of $3,500 approximately 11 years before.

Upon receipt of the certificates, Robson sent them to the Duplex Truck Company with instructions to have them transferred to his name on the corporate records; but was then informed that the stock stood in the name of plaintiff and that duplicate certificates had been issued to him covering the stock that Robson had sent.

On learning of the situation, plaintiff filed his bill of complaint in the circuit court for the county of Ingham, joining Robson, Sturgeon, and the Duplex Truck Company as defendants, and asking a decree declaring him to be the owner of the stock.

Later, other parties made claim to the stock. Marie Dill and Rudolph Stonisch filed bills in Wayne county, and Roy J. McCornac filed a bill in Oakland county, all claiming to be *bona fide* purchasers from Robson, alleging that they had furnished the money to him in order to purchase the stock from the New York insurance department or had advanced money or property to purchase it from Robson. They asked that they be decreed the owners thereof, and that the plaintiff be required to transfer his certificates for the stock to them as owners. Subsequently, these bills were dismissed on stipulation with the original parties to the suit that the plaintiffs in the subsequent suits be permitted to intervene in the present proceeding and file answers and cross bills, which was done. On the hearing of the issues, plaintiff was decreed to be the owner of the stock, and the interveners appeal.

The trial court held that plaintiff had not parted with title at the time he entered into the agreement with Robson & Sturgeon, giving them the stock to hypothecate; that inasmuch as title remained in him, he remained the owner throughout the various transactions, subject to the lien for the loan being repaid; that when the stock was secured by Robson from the New York insurance department, this lien was paid; that Robson was not the owner of the stock; that the interveners purchased the stock from Robson, but that it was never delivered to them; that *bona fide* purchasers of stock, indorsed in blank, do not secure title thereto except upon delivery to them of such stock; and that the interveners had a complete remedy at law against Robson for his failure to deliver the stock which he sold them.

Did plaintiff part with title to the stock when he indorsed it in blank and turned it over to Robson & Sturgeon? This was a question of fact. Although

the stock was given to these parties in November, 1928, the receipt therefor was not given by Robson & Sturgeon to plaintiff until January 29, 1929, and recites:

"Received of James H. Robinson of Lansing, Mich., 2,100 shares of Duplex Truck Company stock to be used as collateral on a loan, the proceeds of which together with $5,000 in cash, receipt of which is hereby acknowledged, are to be used to acquire the property known as the Bridgedale subdivision in Essex County, Ontario. This purchase is to cover the contract running to Geo. A. Erskine and the first mortgage held by Mr. Haskins of Pontiac, Mich.

"When this property is acquired by deed, the whole parcel, approximating 417 lots and $11,400 in lot contracts, is to be sold at the best available price and the moneys put up by James H. Robinson, Nevin Sturgeon and Don J. Robson are to be returned to them pro rata and the profits over and above this are to be divided one-third apiece to James H. Robinson, Nevin Sturgeon and Don J. Robson."

This receipt, as will appear, is not conclusive as to the claims of plaintiff or those of Robson and the interveners. It was given subsequent to the delivery of the stock to Robson, and can be interpreted in various ways.

Was plaintiff's investment in the Bridgedale project to be $5,000 in cash, together with the stock at its cash value? Or was the stock loaned to Robson & Sturgeon for the purpose of securing a loan of money to carry out some other transaction, or for use in their business—and to be later repaid by them, and the stock returned to plaintiff? Or was plaintiff's investment in the real estate to be only $5,000, and the stock loaned to Robson & Sturgeon in order that they could borrow to contribute their

share of the speculation and thereafter pay the loan, redeem their pledge, and return the stock to plaintiff? With several of the above contentions, the receipt is not inconsistent. Furthermore, it was given after the stock was turned over by Robinson; and all of these parties disagree as to the purpose for which the stock was to be used at the time when it was turned over to Robson & Sturgeon.

Plaintiff claimed that the stock was to be pledged for a loan of money to use in the Bridgedale subdivision venture, in which the three parties were interested; and that Robson & Sturgeon were to repay the money loaned and return the stock to plaintiff. Plaintiff further testified that the money secured by the pledge of the stock never went into the Bridgedale venture, and that he does not know what became of it.

Defendant Sturgeon testified that it was his understanding that the stock was to be used to borrow a sum of money for Robson & Sturgeon and that, when such loan was repaid, the stock was to be returned to plaintiff; that Robson & Sturgeon received $3,500 on the loan, using the stock as collateral, and afterward disbursed this money for their personal expenses.

In his amended answer, Robson claims that the transfer of stock was made to him from Robinson in exchange for treasury stock in the Emerson Park Land Company, a corporation in which the parties were interested—or as a loan of the money received from a pledge of the stock to the said company; that afterward it was learned that the Bridgedale subdivision was for sale and plaintiff, Robson, and Sturgeon agreed that the subdivision should be bought and resold to the Emerson company; and that the three parties would divide the profits on such sale; that, in order to purchase the subdivision,

plaintiff advanced $5,000 and it was agreed that the stock, which was previously pledged as collateral for the loan for money received which was to be for the benefit of the Emerson company, would be included in the receipt ''in order to show a greater price as the down payment.''

On the trial Robson testified that the stock was received from Robinson for a payment in another real estate venture in which the three parties were interested, and which was called the Emerson Park Land Company; and that Robson used the stock to borrow $3,500 for this project ''because this payment had to be made by the 1st, and on the 1st of September we took the money over and paid it.'' He further testified that, although the receipt given by him and Sturgeon to Robinson stated that the stock was to be used as collateral for a loan of money to be paid out in acquiring the Bridgedale subdivision, it was not, in fact, so intended; that the stock had been given to him by Robinson some months before the receipt was given, for the purpose of securing money to pay on the Emerson property, which, in fact, was done.

This contrariety of testimony as to the understanding of the parties regarding the intended use of the stock and what was actually done with the proceeds secured by reason of its use as a pledge is here pertinent only on the determination of whether plaintiff parted with title at the time he turned it over to Robson and Sturgeon.

The transactions of the parties are somewhat shrouded and indistinct. Complicated real-estate, corporate, and banking dealings, with shreds of ambiguous records, or unaccompanied by written evidence, the length of time that had elapsed between the transactions and the date of the suit, all of these contribute to cloud the actions and purposes of the

parties. But from this obscurity, there sometimes emerges a guiding point of evidence from which to ascertain the intentions of the parties at that remote period.

Perhaps the most significant portion of the evidence which can be considered as supporting plaintiff's claim that the stock was only loaned to Robson & Sturgeon—in keeping with Sturgeon's testimony that the stock was to be returned to plaintiff—is Robson's testimony, his statement to the New York insurance department, and his personal liability in the pledge transaction. First, he testified that the stock "was loaned to me." It is true he claimed that he was under no duty to pay the loan or return the stock, but he revealed on cross-examination that he had given his own note to the broker, securing the loan on the stock—"backing it up." Further, in his letter to the New York insurance department, in negotiations to secure the stock, Robson stated: "This stock was given me   *   *   *   by a friend of mine, J. H. Robinson.   *   *   *   We have allowed the matter to drift until now that the stock has been located. I feel that it is my place to recover it and return it to him." His only explanation of this statement was: "That was only to request the stock, bill it at a decent price."

We are mindful of the fact that Sturgeon was a witness friendly to plaintiff; that he was indebted to him; that he did not file an answer or contest the suit; and that his testimony was admittedly uncertain in many respects, due to the fact, as he stated, that the transaction had occurred many years prior to the trial. But on a careful examination of the record, we are in accord with the finding of the trial court that the preponderance of the evidence showed that plaintiff merely agreed to permit his stock to be used for a loan, and that the obligation rested upon

Robson to obtain the release of the stock as collateral and return it to plaintiff.

Robson and Sturgeon have not appealed from the decree of the trial court. The interveners claimed that Robson was their broker and that, acting as their agent and using their money or property, he secured the stock on their behalf, and that the delivery to him constituted delivery to them. They further claimed that, if Robson was not their agent, they were *bona fide* purchasers from him, and that there was a delivery of the stock indorsed in blank to them. Further, they contend that, if they are not to be held *bona fide* purchasers, they are entitled to an equitable lien on the stock for the money and property advanced by them; that plaintiff abandoned the stock, and that he is guilty of laches.

Robson testified that, while he had acted in other transactions for the interveners as broker, he was, in reference to the stock here in controversy, acting as a principal. Although the testimony of the interveners is not conclusive or definite on this question, nevertheless in her answer, cross bill, and reply, intervener Dill claims that she purchased the stock from Robson and paid him for it; and it is stipulated that the other interveners also founded their claim upon a purchase of the stock from Robson. Under these facts, we agree with the contention of counsel for plaintiff that Robson did not act in this transaction as an agent for the interveners.

Were the interveners *bona fide* purchasers of the stock, and was delivery thereof made to them?

The uniform stock transfer act (2 Comp. Laws 1929, § 9520 and § 9524 [Stat. Ann. § 19.331 and § 19.335]), insofar as here pertinent, provides:

"SEC. 1. Title to a certificate and to the shares represented thereby can be transferred only,

(a) By delivery of the certificate indorsed either in blank or to a specified person by the person appearing by the certificate to be the owner of the shares represented thereby. * * *

"SEC. 5. The delivery of a certificate to transfer title in accordance with the provisions of section one, is effectual, * * * though made by one having no right of possession and having no authority from the owner of the certificate or from the person purporting to transfer the title."

A blank indorsement of a stock certificate empowers the possessor thereof to pass title by delivery to one who is a purchaser within the statute. *Peckinpaugh* v. *H. W. Noble & Co.*, 238 Mich. 464 (52 A. L. R. 941). The title passes to a good-faith purchaser by delivery. Was there a delivery of the stock by Robson to the interveners?

Intervener McCornac advanced $3,412 to Robson to pay for 1,500 shares of stock, according to his agreement with Robson. The stock was divided into five certificates, four for 500 shares each, and one, for 100 shares. Robson advised McCornac by telephone that the stock had been received by him; but it was never delivered to McCornac. If Robson had delivered three certificates for 500 shares each to him, McCornac would have had title. Instead, Robson sent the certificates to the Duplex Truck Company for transfer to his own name. There was no delivery of the stock to McCornac.

Intervener Stonisch paid for 200 shares and saw the stock in Robson's office; but it consisted only of certificates of 500 shares and 100 shares. He could not have had delivery of any of these certificates for his purchase of 200 shares.

Intervener Dill testified that she paid for 400 shares, and that the stock was handed to her to examine in Robson's office. None of the certificates

corresponded to her purchase of 400 shares; and they could not have been delivered to her for the purchase price she paid. None of the stock was ever delivered to any of the interveners. It was forwarded by Robson to the company to be transferred to himself; and it can be said that there was neither actual nor constructive delivery to the interveners.

The agreement between the interveners and Robson was an executory contract for the sale of stock of the Duplex Truck Company. As the trial court observed, the contract can be fulfilled by the delivery, to such interveners, of any such stock that may be purchased in the open market; and, therefore, the court concluded that these interveners had a full, adequate, and complete remedy at law against Robson.

In their argument, however, the interveners found their claim to equitable relief on the ground that Robson is insolvent. This they base upon an allegation in plaintiff's bill, which was denied by Robson in his answer. No proof was introduced on the point.

With reference to the claim that plaintiff abandoned his stock, we are cited to no authority thereon. Plaintiff always had the right to pay the lien. Cases are also cited by the interveners holding that the purchase of stock from a pledgee, who had exceeded his authority in selling, gives the right of subrogation to such purchaser of any rights said pledgee may have had. These cases are not applicable here.

The interveners were not misled by any action, or inaction, of plaintiff. The lapse of time during which the lien continued did not prejudice them; they had no knowledge as to whether the lien had been in existence 30 days or during the entire period since the stock had been pledged. Plaintiff remained the owner of the stock until it was delivered to a *bona*

*fide* purchaser; and, under the circumstances of this case, cannot be said to be guilty of laches giving interveners the right to the stock.

The trial court, on entry of a decree for plaintiff, allowed plaintiff and the Duplex Truck Company to tax, as costs, attorney fees in the amount of $30 against each of the interveners, the said costs to be equally divided between plaintiff and the company. In chancery cases, where not otherwise provided by law, such allowances are discretionary. 3 Comp. Laws 1929, § 15435 (Stat. Ann. § 27.2524).

Decree affirmed, with costs to plaintiff.

Sharpe, C. J., and Bushnell, Boyles, Chandler, North, Wiest, and Butzel, JJ., concurred.