**RARE EARTH, INC., Plaintiff,**

v.

**Peter HOORELBEKE and Michael Urso, Defendants.**

**Peter HOORELBEKE and Michael Urso, Third-Party Plaintiffs,**

v.

**Gilbert BRIDGES et al., Third-Party Defendants.**

**No. 74 Civ. 3402 (JMC).**

United States District Court, S. D. New York.

July 15, 1975.

Emil, Kobrin, Klein & Garbus, New York City (Martin Garbus and Paul C. Kurland, New York City, of counsel), for plaintiff and third-party defendants Bridges and Guzman.

Guazzo, Silagi & Craner, P. C., New York City (Caesar C. Guazzo and Stephen E. Klausner, New York City, of counsel), for defendants and third-party plaintiffs.

## OPINION AND ORDER

CANNELLA, District Judge:

Rare Earth, Inc., is not, as one might surmise, an organization dedicated to environmental activism or the preservation of our natural resources. Rather, it is the corporate entity formed by a group of rock and roll musicians who publicly perform as "RARE EARTH". From this group "comes the dissonant chord" [1] of an intracorporate battle for control resulting from a schism among the band members in July, 1974.

Predicating jurisdiction on the Lanham Act,[2] the two resultant corporate factions ask the Court to decide which individuals may continue to publicly perform as "RARE EARTH". For the reasons expressed in this opinion, we conclude that shareholders Bridges and Guzman possess a controlling interest in Rare Earth, Inc. However, because of the failure of these persons to conform to the dictates of Michigan law, we find that the plaintiff, Rare Earth, Inc., may not obtain the affirmative relief sought in this proceeding. Accordingly, both the complaint and the counterclaims-third-party complaint will be dismissed.

## THE UNDERLYING FACTS

"RARE EARTH" is a rock and roll performing group which has recorded several record albums and which enjoys national prominence in rock music cir-

1. *N. L. R. B. v. Rochester Musicians Assn. Local 66*, 514 F.2d 988, 989 (2 Cir. 1975). As Judge Timbers recently stated in *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331 (2 Cir. 1975), a case involving the infringement of a piano manufacturer's trademark: "This is not a case for music lovers. It involves not the dulcet sounds one expects from concert grand pianos, but the discordant notes from a cacophony for pianos extending back more than a century." While one would not expect dulcet tones to emanate from a rock and roll ensemble such as "RARE EARTH", we sim-

ilarly do not believe that rock music lovers will find this decision reprinted in the pages of "Billboard" or "Rolling Stone" magazine.

2. No diversity of citizenship jurisdiction (28 U.S.C. § 1332) exists in this case, either with regard to the plaintiff's complaint or the defendants' counterclaims-third-party complaint. All of the individuals who are party to this litigation are citizens of California and Rare Earth, Inc., although a Michigan corporation, has its principal place of business in California. 28 U.S.C. § 1332(c).

cles. The group was organized in the late 1960s and originally consisted of five performers. A sixth member, Edward Guzman, later joined the band.

As the Rare Earth group gained national exposure and the revenues it derived from concerts and recordings increased, the "RARE EARTH" name became a valuable asset. As a result, counsel, Henry Baskin, suggested that a corporation be formed. In July, 1970, the plaintiff, Rare Earth, Inc., was incorporated under Michigan law. 50,000 shares of capital stock were authorized in the articles of incorporation and 1,200 shares were subscribed to by the band members. As to 1,000 of these shares, it is conceded that the five original band members each received 200 shares. As to the remaining 200 shares, the parties vigorously dispute whether Edward Guzman ever became their lawful owner.

As time passed three of the original members departed from the Rare Earth group and three new performers were engaged to replace them. It is not disputed that two of the departing members severed all ties with the group and transferred their stock back to the corporation. However, the litigants disagree dramatically concerning the present status in the corporation of the third, Kenneth Folcik.

The Rare Earth group, consisting of two original members, Hoorelbeke and Bridges, as well as Guzman and the three replacement performers, continued to perform as a unit until July, 1974. However, at that time, the group divided into two factions, each of which now claims control of the corporation and the right to perform as "RARE EARTH". The first faction consists of Bridges, Guzman and two others; the second, of defendants Hoorelbeke and Urso. The Bridges-Guzman faction has presently placed itself in control of the corporation and currently performs as "RARE EARTH". The Hoorelbeke faction challenges this position and claims a majority interest in the corporation and the

right to use the "RARE EARTH" mark. The differing views entertained by these individuals has resulted in this litigation.

In a nutshell, both factions concede that Bridges and Hoorelbeke each owns 200 shares of Rare Earth, Inc. In dispute between them is whether Guzman and Folcik are presently shareholders. The Bridges-Guzman faction asserts that Guzman owns 200 shares of Rare Earth, Inc. and that Folcik does not; thus they claim control of 400 of 600 outstanding shares of the corporation. Hoorelbeke, on the other hand, claims that Folcik remains a shareholder and that he, Hoorelbeke, is the voting trustee for the Folcik shares. This claim, when coupled with Hoorelbeke's assertion that Guzman is not a stockholder, allegedly places working corporate control in his grasp. We discuss the merits of the two contested positions *infra* (Point IV), and note for present purposes only that each challenged claim of stock ownership turns upon a construction of Michigan law (either the Michigan Business Corporation Act or Article 8 of the Michigan Uniform Commercial Code). Thus, plaintiff's counsel is quite accurate when he states:

> this matter concerns the determination of one straight-forward issue. This issue is who owns the right to use the trademark "Rare Earth" in connection with (1) rock and roll music public entertainment performances; (2) the sale of records and tapes; and (3) for all legitimate purposes. By stipulation it was agreed that all of the rights in the trademark "Rare Earth" are owned by plaintiff corporation Rare Earth, Inc. . . . Therefore, the only issue for this Court is who owns the stock in the plaintiff corporation.[3]

### THE PRESENT LITIGATION

The plaintiff, Rare Earth, Inc., commenced this action on August 5, 1974 by filing a complaint alleging both Lanham

---

3. Plaintiff's Post-Trial Memorandum at 2.

Act and pendent state law claims. The first count of the complaint recites what may be termed the § 43(a), 15 U.S.C. § 1125(a), litany: infringement, confusion, deception of the public, palming off, false advertising, false designation of origin, false representation and description in commerce, unfair competition and loss of good will. Almost immediately thereafter, on August 26, 1974, the corporation succeeded in obtaining a temporary restraining order from Judge Owen. In essence, this order (1) prohibited the institution of lawsuits relating to Rare Earth, Inc. or the mark "RARE EARTH" and stayed all pending actions; (2) restrained defendant Hoorelbeke from representing the extent of his share ownership in Rare Earth, Inc. to the musical entertainment community; and (3) enjoined the defendants "from taking any action or making any announcement to the musical entertainment field which would tend to interfere with the continued public performance of the Rare Earth group." On September 5, 1974, Judge Conner extended the temporary restraining order until September 13th and on September 11th, in order that they might enjoy adequate pretrial discovery, the parties stipulated that the restraining order be continued in effect until such time as we had decided plaintiff's application for a preliminary injunction. *See,* Fed.R.Civ.P. 65(b).

In October, 1974, the defendants filed an answer in which numerous affirmative defenses and counterclaims are asserted. The first counterclaim independently places jurisdiction upon § 43(a) of the Lanham Act [4] and is a mirror image of the plaintiff's federal claim. Subsequently, with leave of this Court, the defendants filed a third-party complaint which joins four of the present members of the Rare Earth group, Bridges, Guzman, Olson and Monette as defendants on the counterclaims. *See,* Fed.R.Civ.P. 13(h).

On December 3, 1974, we commenced a hearing on plaintiff's application for a preliminary injunction. During the preceding months the parties had engaged in extensive and vigorous discovery [5] which prompted us to order that "the trial of the action on the merits to be advanced and consolidated with the hearing of the application." Fed.R.Civ. P. 65(a)(2). An advisory jury was empanelled pursuant to Fed.R.Civ.P. 39(c), and it was ultimately asked to consider one of the factual disputes at issue.[6] The trial was concluded on December 6, 1974 and, thereafter, the parties submitted post-trial and supplemental post-trial memoranda to the Court.

## DISCUSSION

### I

The plaintiff's complaint must be dismissed, albeit without prejudice. In their third affirmative defense (Answer ¶ 5), the defendants assert that "Neither a majority of the directors nor of the shareholders of Rare Earth, Inc.,

---

4. Although the first counterclaim (and the first count of the third-party complaint) is denominated as arising under 15 U.S.C. § 1125(b), it is obvious from the allegations contained therein (*see,* Point III *infra*) that the claim stated derives from § 1125(a). § 1125(b) states that:

> Any goods marked or labeled in contravention of the provisions of this section shall not be imported into the United States or admitted to entry at any customhouse of the United States. The owner, importer, or consignee of goods refused entry at any customhouse under this section may have any recourse by

protest or appeal that is given under the customs revenue laws or may have the remedy given by this chapter in cases involving goods refused entry or seized.

5. The very able assistance and supervision of Magistrate Goettel prevented the discovery proceedings herein from becoming chaotic. It was through his good offices that this case was so expeditiously prepared for trial.

6. The advisory jury concluded that Edward Guzman was a shareholder of Rare Earth, Inc. We concur in this finding. *See* Point IV *infra*.

*voting at a duly constituted meeting,* authorized counsel to be retained or to initiate suit." (Emphasis added.) Although not for the precise reasons advanced, we find this position well founded in law and fact.

■ The defendants couch their present challenge in terms of the *ultra vires* doctrine. However, that doctrine, which is severely restricted in application by Michigan statute (Mich.Comp. Laws Ann. § 450.1271), clearly does not pertain to the facts at bar. *See also, Madison National Bank v. Lipin,* 57 Mich.App. 706, 226 N.W.2d 834, 838 (1975); 7 Michigan Law & Practice Encyclopedia, Corporations § 349 at 302. "An *ultra vires* act has been defined as an act beyond the scope of the powers of a corporation, as defined by its charter or articles of incorporation" and, under Michigan law, "it has generally been said that 'except in cases where the rights of the public are involved, the plea of ultra vires . . . will not be allowed where it will not advance justice, but will accomplish a legal wrong.'" 7 Michigan Law & Practice Encyclopedia, Corporations § 348 at 300–01. Mich.Comp.Laws Ann. § 450.1261 provides that "A corporation . . . shall have power in furtherance of its corporate purposes to . . . (b) Sue and be sued in all courts and participate in actions and proceedings, judicial, administrative, arbitrative or otherwise, in like cases as natural persons." *See also,* 7 Michigan Law & Practice Encyclopedia, Corporations § 461 at 376. In view of the dictates of the corporate-power-to-sue statute, *supra,* the *ultra vires* doctrine, on its face, does not apply and the Court need not inquire into the equities of its invocation. Rather, the third affirmative defense is properly looked upon as a challenge to the corporation's exercise of its statutory power to commence litigation. *Cf., Bliss Petroleum Co. v. McNally,* 254 Mich. 569, 237 N.W. 53, 55 (1931).

Prior to the dissension which emerged in July, 1974, between the members of the Rare Earth group, it is undisputed that Peter Hoorelbeke served as a director and president, as well as a 200 share owner of Rare Earth, Inc. However, in mid-July the Bridges faction became aware (through the musical "grapevine") of Hoorelbeke's purported resignation as a band member and as an officer and director of the corporation. Such knowledge did not derive from any written communication from Hoorelbeke to the corporation, but rather resulted from rumor, or, to use a legal term, hearsay. Thereafter, on July 12th, a directors' (or shareholders') meeting of Rare Earth, Inc. was convened in Los Angeles. Hoorelbeke was never notified of such meeting and did not attend; the Bridges faction acting upon "their sincere belief that Hoorelbeke had resigned [concluded that] there was no need to notify him of the meeting."[7] At this July 12th meeting, it was decided that Bridges would replace Hoorelbeke as president of Rare Earth, Inc., and that the corporation would commence this action and retain counsel for its prosecution. As we will show *infra,* the actions taken on July 12th were improper.

■ Under Michigan law, "A director may resign by written notice to the corporation. The resignation is effective upon its receipt by the corporation or a subsequent time as set forth in the notice of resignation." Mich.Comp.Laws Ann. § 450.1505(2). An identical provision pertains with regard to the resignation of officers. Mich.Comp.Laws Ann. § 450.1535(3). As one federal court has stated with regard to a similar provision of the Delaware code,

> it can . . . be inferred that it was the policy of this legislation that a resignation be unequivocal, in writing, and that it be communicated to the corporation. The necessity for written notice to the corporation before a director's resignation becomes

effective clearly indicates an intent to outlaw secret, covert resignations in order to enable the other directors to know at all times the status of their fellow directors. Therefore, the Court interprets that phrase "written notice to the corporation," used in 8 Del.C. § 141(b) in connection with the resignation of a director, to mean actual written notice to each and every member of the Board of Directors or actual written notice to an agent of the corporation, such as its Chairman of the Board, President, or Secretary. *Dillon v. Berg*, 326 F.Supp. 1214, 1224 (D.Del.1971), *aff'd*, 453 F.2d 876 (3 Cir. 1972). *Compare*, 2 W. Fletcher, *Private Corporations* § 346 at 143–44 (perm. ed. rev. 1969). There is no evidence at bar of a written resignation transmitted by Hoorelbeke to the corporation and thus,

as of the July 12th meeting, he remained a director, officer and shareholder of Rare Earth, Inc. This being so, the failure to notify Hoorelbeke of the meeting and his absence therefrom renders all actions taken by those present invalid and without effect.

With regard to directors' meetings, Michigan law requires that a "special meeting shall be held upon notice as prescribed in the bylaws" (Mich.Comp.Laws Ann. § 450.1521(2)) and that a "director is entitled to a notice which will give him ample time to attend the meeting." [8] 7 Michigan Law & Practice Encyclopedia, Corporations § 273 at 230. The statutory requirement that the meeting be convened "upon notice" [9] clearly was not met in the present case, as Hoorelbeke received no notice whatsoever.[10] Thus, it is a settled mat-

---

**8.** Section 450.1525 of the Mich.Comp.Laws Ann. provides that

Unless otherwise provided by the articles of incorporation or bylaws, action required or permitted to be taken pursuant to authorization voted at a meeting of the board or a committee thereof, may be taken without a meeting if, before or after the action, all members of the board or of the committee consent thereto in writing. The written consents shall be filed with the minutes of the proceedings of the board or committee. The consent has the same effect as a vote of the board or committee for all purposes.

In the present case, it is obvious that Hoorelbeke did not consent to the actions taken at the July 12, 1974 meeting. *See*, Exhibit 22.

**9.** Fletcher observes that: "The great weight of authority . . . is to the effect that notice of a special meeting must be given to every director, unless there is some express provision in the charter or bylaws or established usage to the contrary, or unless it is impossible or impracticable to do so." 2 W. Fletcher, *supra* § 406 at 255. The Rare Earth, Inc. articles of incorporation are silent on this subject and, in view of the fact that they were not introduced into evidence, we cannot presume that the bylaws eliminate the statutory notice requirement. Moreover, plaintiff has shown no established corporate practice which abrogates the notice requirement for special meetings. At best, an erroneous exercise of judgment, rather than im-

possibility or impracticability, explains the corporation's failure to notify Hoorelbeke. We, therefore, conclude that notice, as specified in the Michigan statute, was a necessary prerequisite to the proper convening of the July 12, 1974 meeting. *Cf., Knox v. Commissioner*, 323 F.2d 84, 88 (5 Cir. 1963) (Georgia law) ; *Rapoport v. Schneider*, 29 N.Y.2d 396, 401, 328 N.Y.S.2d 431, 436, 278 N.E.2d 642, 645 (1972) (New York law).

**10.** The rationale for the statutory notice requirement has been explained by the Michigan Supreme Court in the following terms:

In the absence of statutory authority no decision or act done by any number of the board of directors while not duly assembled as a board is a valid corporate act. [Citation omitted.] To hold that certain directors could form a quorum by coming upon another in a room, or in the street, and, despite the protests of that other, could, by merely declaring the body of persons so gathered together to be a meeting, actually give it that complexion, would be illegal. [Citation omitted.] A director of a corporation is not to be trapped into attendance of a meeting against his will. The directors of a corporation have no authority to act as a board of directors except at a regularly constituted meeting in the absence of a consent in writing [citation omitted]. But if all of the members of the board of directors are present and participate in the meeting or proceedings, then the meeting may be said to be duly and legally held.

ter of Michigan law that "where a written notice of the meeting of the board of directors is not given although required by either a statute or the corporate by-laws, any action taken by the meeting at which all the directors are not present is void." 7 Michigan Law & Practice Encyclopedia, Corporations § 273 at 230, citing *Bourne v. Sanford,* 327 Mich. 175, 41 N.W.2d 515 (1950). *See also, Zachary v. Milin,* 294 Mich. 622, 293 N.W. 770 (1940); Michigan Law & Practice, Corporations § 272 at 228 (and the cases collected in n. 13); 2 W. Fletcher, *supra* § 406 at 255–56. The import of the foregoing discussion is plain: the failure to notify Director Hoorelbeke of the July 12th meeting and his absence therefrom renders all actions taken threat invalid, including such action as was required to commence this suit either directly or through the appointment of Bridges as President. *Cf. Covington Housing Development Corp. v. City of Covington,* 381 F.Supp. 427, 430–31 (E. D.Ky.1974).

■ If the July 12th meeting is deemed a shareholders' meeting, the actions taken threat similarly must fail for noncompliance with the notice requirements contained in Mich.Comp. Laws Ann. § 450.1404(1) or with the consent provisions contained in § 450.-1407.

A corporation has been defined as a body of individuals united as a single separate entity. When corporate powers are vested in the shareholders or members, they repose in them collectively as a body and not as individuals. That is, individuals have no power to act as or for the corporation except at a corporate meeting called and

conducted in accordance with law. 6 Callaghan, Michigan Civil Jurisprudence (1958).

*Studebaker Corp. v. Allied Products Corp.,* 256 F.Supp. 173, 189 (W.D.Mich. 1966). Simply put, as with the case of directors, actions taken at a shareholders' meeting which has not been properly noticed are invalid and without effect. *Darvin v. Belmont Industries, Inc.,* 40 Mich.App. 672, 199 N.W.2d 542 (1972).

■ Thus, we conclude that the meeting of Rare Earth, Inc. which was conducted on July 12, 1974 was a nullity for failure to comply with Michigan law. This being so, the statutory corporate power to commence litigation was not properly exercised. "Suits by corporations must be instituted . . ., as other acts by corporations must be done, by proper authority. The proper persons to authorize the commencement of a suit . . . on behalf of a corporation are primarily the directors, but the power may be vested in the president" as well. 9 W. Fletcher, *supra* § 4216 at 18–19 (rev. 1964) (footnotes omitted). Here, the actions taken by the directors (or shareholders) toward commencement of this suit are invalid, as are any actions taken by Bridges as president, whose election to that post is similarly tainted. While, "A subsequent ratification is equivalent to original authority for this purpose" (*id.* at 22), the facts at bar will not support a finding of ratification. There is no proof in the record that a duly constituted meeting or other action by the shareholders, directors or officers of Rare Earth, Inc. subsequently assented to the commencement of this action.[11] The complaint must be

---

*Zachary v. Milin,* 294 Mich. 622, 293 N.W. 770, 771 (1940). *See,* 7 Michigan Law & Practice Encyclopedia, Corporations § 273 at 230–31.

11. As Fletcher observes: "directors cannot ratify their own unauthorized acts; even though they constitute a majority of the directors or of the stockholders. . . . In like manner a de facto board of directors

cannot ratify its own acts." 2 W. Fletcher, 1969) (footnotes omitted). *See also, Id.* § 762. While "the directors who own and control a majority of the corporate stock cannot ratify their . . . unauthorized acts" they may circumvent this principle "by calling a stockholders' meeting which they control . . . and causing a majority of the stock to be voted in favor of the ratification." *Id.* § 761 at 1069–70. No evidence

**34**

dismissed for failure of Rare Earth, Inc., its directors and shareholders to abide by and conform to the dictates and requirements of Michigan Corporate law. *Cf.*, Fed.R.Civ.P. 17(b).[12]

## II

■ The improper commencement of the main action on behalf of Rare Earth, Inc. and its dismissal by this Court does not conclude the matter. In their answer the defendants have asserted numerous counterclaims, the first of which is premised upon § 43(a) of the Lanham Act, which is also the basis for the first claim in their third-party complaint. Although the counterclaim is properly perceived as one which is compulsory under Fed.R.Civ.P. 13(a), it is nonetheless properly before the Court at this time because it is predicated upon federal jurisdiction independent of the complaint. As Professors Wright and Miller point out: "if the counterclaim does present an independent basis for federal jurisdiction, the court may adjudicate it as if it were an original claim despite the dismissal of plaintiff's claim." 6 C. Wright & A. Miller, *Federal Practice and Procedure* § 1414 at 80 (1971) (and the cases collected at n. 87). *Accord, National Research Bureau, Inc. v. Bartholomew,* 482 F.2d 386, 388–89 (3 Cir. 1973); *Byrnes v. Faulkner, Dawkins & Sullivan,* 362 F.Supp. 864, 868–69 (S.D.N.Y.1973) (Gurfein, J.); *Spivak v. United States,* 254 F.Supp. 517, 523 (S. D.N.Y.1966), *aff'd,* 370 F.2d 612 (2 Cir.), *cert. denied,* 387 U.S. 908, 87 S.Ct. 1690, 18 L.Ed.2d 625 (1967);[13] 3 J. Moore, *Federal Practice* ¶ 13.15[1] at 13–382 (2 ed. 1974); *cf., Int'l Video Corp. v. Ampex Corp.,* 484 F.2d 634 (9

*supra* § 761 at 1068–69 (perm. ed. rev. of any properly constituted shareholder ratification was introduced, but even if it had been, we could not consider that evidence until we first determined which individuals control a majority of the stock of Rare Earth, Inc., the major issue in this litigation. *See also,* 7 Michigan Law & Practice Encyclopedia, Corporations §§ 411–15 at 345–49.

12. Had this action been properly instituted by Rare Earth, Inc., we would nonetheless have grave doubts concerning the viability of finding the defendants in violation of § 43(a). Despite the allegations of the complaint, after trial plaintiff placed reliance upon three theories of Lanham Act liability: (1) that Hoorelbeke and Rosefielde caused a new Rare Earth, Inc. to be incorporated in Delaware; (2) that Hoorelbeke interfered with the free use and enjoyment of the "RARE EARTH" name and mark by instituting numerous lawsuits; and (3) that, unless the defendants are restrained, they will infringe upon the "RARE EARTH" trademark and exploit it for their own benefit. As to the first of these contentions, the formation of Rare Earth Delaware seventeen months *ante litem motam,* at a time when Hoorelbeke served as president of Rare Earth, Inc. and no dissension existed within the group, does not impress us as the sort of conduct prohibited by the Lanham Act. This is especially so, in view of the fact that no stock has ever been issued by the Delaware corporation and it has not functioned in any fashion. Similarly, in light of the hotly disputed claims of stock ownership involved in this case, the commencement of litigation by Hoorelbeke relevant to that issue does not appear to have been inappropriate. A stockholder has the right to bring suit against a corporation to enforce his shareholder's contract or to prevent those in control from committing a wrong against either himself or the corporation. *See generally,* 13 W. Fletcher, *supra* §§ 5915–30 (rev. 1970). As to the last claim advanced by plaintiff, no evidence was introduced to show that either Hoorelbeke or Urso had held himself out as "RARE EARTH" or as a member of the group subsequent to the events of July, 1974 or that either individual intends to so do in the future (unless, of course, under the aegis of the corporation). We have been afforded no basis for the supposition that the defendants would not abide by the adjudication of a court of competent jurisdiction regarding the issue of stock ownership and resultant corporate control. *Compare National Lampoon, Inc. v. American Broadcasting Cos., Inc.,* 376 F.Supp. 733 (S.D.N.Y.), *aff'd,* 497 F.2d 1343 (2 Cir. 1974) (*per curiam*).

13. Judge Levet states: "It is well settled that, although the complaint be dismissed, jurisdiction over the counterclaim may be retained when it seeks affirmative relief and an independent basis of federal subject matter jurisdiction exists." 254 F.Supp. at 523.

Cir. 1973). In *National Research, supra,* 482 F.2d at 388–89, the Third Circuit concisely stated the relevant principles and considerations in the following fashion:

the counterclaim, though compulsory, was supported not only by ancillary jurisdiction but also by allegations of independent jurisdiction. Once an issue with independent subject matter jurisdiction is before the court and jurisdiction over the parties has been perfected, it must be allowed to proceed to a conclusion pursuant to the rules of civil procedure like any other routine federal claim. This principle has been recognized in relation to permissive counterclaims, where the issue more usually arises because permissive counterclaims require independent jurisdiction. See Moore's Federal Practice, ¶ 13.23. But the crucial issue is not whether the counterclaim is compulsory or permissive. Indeed, on that consideration alone it would seem more logical to retain compulsory counterclaims and dismiss permissive ones. The issue rather is the nature of the jurisdiction supporting the counterclaim, whether compulsory or permissive. Where jurisdiction is merely ancillary, the Court has discretion to dismiss if the original claim supporting it is disposed of. But where, as here, jurisdiction is independent, the counterclaim must be allowed to proceed without regard to the fate of the original claim, and it was error to dismiss it out of hand. There is no justification for putting the plaintiff in counterclaim to the expense, effort and risk of refiling his claim and attempting to re-establish personal jurisdiction over the opposing party. [Footnotes omitted.]

Similarly, in view of the fact that the third-party action against Bridges, Guzman, Olson and Monette is, in fact, no more than a mechanism which joins these individuals as additional defendants on the counterclaims pursuant to Fed.R.Civ.P. 13(h),[14] it is likewise supported by independent Lanham Act jurisdiction and should be allowed to proceed to an adjudication. *See, Ferreira v. Sawayama-Kisen KK*, 171 F.Supp. 96 (S.D.N.Y.1959); 6 C. Wright & A. Miller, *supra* § 1444 at 237; 3 J. Moore, *supra* ¶ 14.26 at 14–532—14–533.

Thus, we find that the defendants, through the vehicle of their first counterclaim-third-party complaint, have invoked the subject matter jurisdiction of this Court without need of reference to the complaint.[15] The individual third-party defendants Guzman and Bridges, being before the Court and the defendants having moved for judgment on their claims,[16] we conclude that the present controversy between these parties is properly before this Court and is ripe for adjudication.

### III

In their first counterclaim (as well as in the first count of the third-party complaint) Hoorelbeke and Urso have stated a claim arising under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), at least as against the individual third-party defendants, Bridges, Guzman, Mo-

---

14. *See,* third-party complaint ¶ 2 and Exhibit C thereto (endorsement and order of this Court granting leave pursuant to Fed.R.Civ. P. 13(h)).

15. Although a difference of opinion exists between federal courts with regard to whether federal subject matter jurisdiction flows directly from § 43(a) or need be derived from 28 U.S.C. § 1338(a) or 15 U.S.C. § 1121, see the text and cases noted in Germain, *Unfair Trade Practices Under Section 43(a)*

of the Lanham Act: You've Come A Long Way, Baby—Too Far, Maybe?, 64 Trademark Reporter 193, 199–200 and nn. 38–44, such esoteric matters are beyond the scope of this opinion. Whatever theory is invoked, federal jurisdiction exists when a cognizable § 43(a) claim has been stated.

16. Defendants' Post-Trial Memorandum at 59; Defendants' Supplemental Memorandum at 10.

nette and Olson.[17] Section 43(a), 15 U. S.C. § 1125(a), provides that:

Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.[18]

In the development of § 43(a) case law, the decision of the Third Circuit in *L'Aiglon Apparel, Inc. v. Lana Lobell, Inc.*, 214 F.2d 649 (3 Cir. 1954), stands as a benchmark. Judge Hastie, speaking for the court, there concluded that by virtue of § 43(a) "Congress has defined a statutory civil wrong of false representation of goods [and services] in commerce and has given a broad class of suitors injured or likely to be injured by such wrong the right to relief in the federal courts." *Id.* at 651. That Hoorelbeke and Urso have alleged facts sufficient to bring them within the ambit of this *sui generis* statutory tort is clearly manifested by reference to their pleadings. In summary, the contentions posited by the defendants are as follows:

(1) that in July, 1974, the third-party defendants unlawfully usurped control of Rare Earth, Inc. and, thereupon illegally discharged Hoorelbeke and Urso; (2) that, thereafter, the third-party defendants arrogated to themselves the right to perform under the "RARE EARTH" name; (3) that since July 1974 these individuals have falsely identified themselves as the "RARE EARTH" performing group and have improperly claimed the right to use the corporate name and mark in connection with their musical entertainment services; (4) that the third-party defendants have used and intend to continue to use the "RARE EARTH" name and mark as a false description and false representation for themselves and for others acting in concert with them as a musical performing group; (5) that this conduct has caused or is likely to cause confusion of or mistake by the public and result in damage to the goodwill belonging to Rare Earth, Inc. and to the defendants in the "RARE EARTH" mark and name; (6) that the third-party defendants have acted and are acting to palm off their services as rendered, authorized, sponsored or endorsed by Rare Earth, Inc.; (7) that the conduct of the third-party defendants has been in or affecting interstate commerce; and (8) that Hoorelbeke and Urso are being and are likely to be damaged as the result of these activities. (Answer ¶¶ 7–19; Third-Party Complaint ¶¶ 7–19.) These pleaded assertions, together with the established fact that the Bridges-Guzman faction has, since July 12, 1974, performed and held itself out in interstate commerce as the Rare Earth performing group, when joined with the stipulated fact that Rare Earth, Inc. is the owner of the "RARE EARTH" name and

17. Only Bridges and Guzman have appeared herein.

18. For a general overview of § 43(a) law, *see*, 1 R. Callmann, *Unfair Competition, Trademarks & Monopolies* § 18.2(b) at 619–26 (3 ed. 1967) ; J. Gilson, *Trademark Protection & Practice* §§ 7.02–7.02[3] at 7–8–7–25 (1974) ; 2 J. T. McCarthy, *Trademarks & Unfair Competition* §§ 27:1–27:12 at 241–264 (1973) ; Germain, *supra* n. 15, 64 Trademark Reporter 193.

mark,[19] clearly satisfy the statutory requisites.[20]

[7-9] Section 43(a) of the Lanham Act was enacted by Congress to protect

19. The "RARE EARTH" name and trademark is not registered. However, it is settled law that registration is not a prerequisite to Lanham Act jurisdiction; common law marks enjoy the protection of § 43(a). *National Lampoon, Inc. v. American Broadcasting Cos., Inc.*, 376 F.Supp. at 747 (S.D.N.Y.), *aff'd*, 497 F.2d 1343 (2 Cir. 1974); *Ames Publishing Co. v. Walker-Davis Publications, Inc.*, 372 F.Supp. 1, 11 (E.D.Pa. 1974); *Natcontainer Corp. v. Continental Can Co.*, 362 F.Supp. 1094, 1100 (S.D.N.Y. 1973); *Mortellito v. Nina of California, Inc.*, 335 F.Supp. 1288, 1294 (S.D.N.Y.1972); *N. S. Meyer, Inc. v. Ira Green, Inc.*, 326 F. Supp. 338, 342 (S.D.N.Y.1971).

In addition, the parties agree that "RARE EARTH" is a valid and valuable trademark which has acquired a secondary meaning in that rock music aficionados associate the group with a particular style or variety of musical performance. In view of this stipulation, no evidence was presented with regard to the public consciousness of the group and we need not pass upon the issue. However, we note that trademarks and trade names associated with musical performing groups present potentially difficult legal problems. Imagine, for example, a group which lawfully acquires the "Beatles" trademark and performs without one or more of John, Paul, George or Ringo or "Jimmy Dorsey's Orchestra" without Jimmy Dorsey. Could the corporate owner of the "Rolling Stones" mark replace the present members of the group and continue to sell out Madison Square Garden? In short, can the public consciousness of and secondary meaning acquired by a performing group's trade name survive personnel changes? *Cf.*, Note, *Intellectual Property-Performer's Style—A Quest for Ascertainment, Recognition and Protection*, 52 Denver L.J. 561, 576–78 (1975).

20. Throughout the course of these proceedings we entertained lingering doubts concerning our subject matter jurisdiction. *See, e. g.*, Tr. at 232–33. These uncertainties flowed from our recognition of the well-settled proposition established in trademark, patent and copyright cases that a suit wherein an affirmative declaration of title or ownership to the mark, patent or copyright is sought is not within the jurisdiction of a federal court. *Luckett v. Delpark*, 270 U.S. 496, 46 S.Ct. 397, 70 L.Ed. 703 (1926); *Wilson v. Sanford*, 51 U.S. 99, 13 L.Ed. 344 (1850); *Simon & Flynn, Inc. v. Time, Inc.*, 513 F.2d 832 (2 Cir. 1975); *Arvin Indus-*

*tries, Inc. v. Berns Air King Corp.*, 510 F.2d 1070 (7 Cir. 1975); *T. B. Harms Co. v. Eliscu*, 339 F.2d 823 (2 Cir. 1964), *cert. denied*, 381 U.S. 915, 85 S.Ct. 1534, 14 L.Ed.2d 435 (1965), *aff'g*, 226 F.Supp. 337 (S.D.N.Y.1964); *Everest & Jennings, Inc. v. E & J Mfg. Co.*, 263 F.2d 254 (9 Cir. 1958), *cert. denied*, 360 U.S. 902, 79 S.Ct. 1284, 3 L.Ed. 2d 1254 (1959); *Laning v. National Ribbon & Carbon Paper Mfg. Co.*, 125 F.2d 565 (7 Cir. 1942); *Plum Tree, Inc. v. Seligson*, 342 F.Supp. 1084 (E.D.Pa.1972); *Elan Associates, Ltd. v. Quackenbush Music, Ltd.*, 339 F.Supp. 461 (S.D.N.Y.1972); *Muse v. Mellin*, 212 F.Supp. 315 (S.D.N.Y.1962), *aff'd mem.*, 339 F.2d 888 (2 Cir. 1964); *Cresci v. Music Publishers Holding Corp.*, 210 F.Supp. 253 (S.D.N.Y.1962); *Harrington v. Mure*, 186 F.Supp. 655 (S.D.N.Y.1960); *Photometric Products Corp. v. Radtke*, 17 F.R.D. 103 (S.D.N.Y.1954); *Binger v. Unger*, 6 F.R.D. 44 (S.D.N.Y.1946); 13 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3582 (1975). However, once it is recognized that the allegations of the first counterclaim-third-party complaint state a claim for "false advertising" under § 43(a) of the Lanham Act, hence affording the Court with proper subject matter jurisdiction, it follows therefrom that we do have competence to decide the incidental issue of stock ownership which, in essence, is raised as a defense to the pleaded Lanham Act claims. *Cf., Harrington v. Mure, supra*, 186 F.Supp. at 657:

> In other words, in order to determine the federal claim for infringement, the district court, as a preliminary matter, permits the plaintiff to establish the facts which underlie his claim of ownership. [Citations omitted.] Incidental power to hear and decide the title claim—a claim as to which the court lacks original jurisdiction —must, and does depend upon the specifically conferred power to adjudicate the infringement claim. [Citation omitted.] Absent such incidental power or ancillary jurisdiction in the district court to determine whether a plaintiff has standing as an owner to sue for infringement, the plaintiff whose citizenship is the same as that of his adversary would be forced to look to the state court in the first instance. [Footnote omitted.]

*See also, Muse v. Mellin, supra*, 212 F.Supp. at 318; *Cresci v. Music Publishers, supra*, 210 F.Supp. at 257; 2 J. McCarthy, *Trademarks and Unfair Competition* § 33:5 at 543 (1973). *But see*, the discussion at p. 48.

persons engaged in interstate commerce from the kind of unfair competition wherein a false designation of origin or false description or representation is employed; unfair competition which is akin to the misuse of trademarks.[21] In *Alfred Dunhill Ltd. v. Interstate Cigar Co.*, 499 F.2d 232, 236 (2 Cir. 1974), the Second Circuit re-emphasized the perimeters of § 43(a) when it noted that

> although the Act was intended to enlarge the category of activities proscribed by federal law in 1946 and to be "broadly construed," within that context, *see Geisel v. Poynter Products, Inc.*, 283 F.Supp. 261 (S.D.N.Y. 1968), *the courts have been careful to recognize that § 43(a) does not have boundless application as a remedy for unfair trade practices but is limited to false advertising as that term is generally understood.* See 1 Callman, Unfair Competition, Trademarks & Monopolies § 18.2(b).

(Emphasis added.) Thus, as Judge Gurfein has observed, "The gist of the action under this section is a use of the mark or trade-name in interstate commerce which is likely to cause confusion or to deceive purchasers as to the source of origin of the goods [or services]."

*Mortellito v. Nina of California, Inc.*, 335 F.Supp. 1288, 1294 (S.D.N.Y.1972). *Accord, National Lampoon, Inc. v. American Broadcasting Cos., Inc.*, 376 F. Supp. 733, 746 (S.D.N.Y.), *aff'd*, 497 F. 2d 1343 (2 Cir. 1974); *Geisel v. Poynter Products, Inc.*, 283 F.Supp. 261, 267 (S. D.N.Y.1968). *See also, Federal-Mogul-Bower Bearings, Inc. v. Azoff*, 313 F.2d 405, 409 (6 Cir. 1963). As Judge Herlands aptly recognized in *Geisel v. Poynter Products, Inc., supra*, 283 F.Supp. at 267, the essence of a § 43(a) claim is the misuse of a "distinguishing characteristic" of a manufacturer's product or of the manufacturer himself causing confusion to the buying public as to the origin of the product, which may arise from "a 'false representation', whether express or implied, that a product was authorized or approved by a particular person . . .."[22] *See also, Parkway Baking Co. v. Freihofer Baking Co.*, 255 F.2d 641, 648 (3 Cir. 1958); *Cf., Societe Comptoir De L'Industrie Cotonniere Establissements Boussac v. Alexander's Department Stores, Inc.*, 299 F.2d 33 (2 Cir. 1962). On the facts alleged and adduced it is an inescapable conclusion that Hoorelbeke and Urso have stated a claim within the compass of § 43(a).[23]

21. It is clear, both from . . . the intent and from a reading of the Act as a whole, that the primary purpose of the Act was to eliminate deceitful practices in interstate commerce involving the misuse of trade-marks, but along with this it sought to eliminate other forms of misrepresentations which are of the same general character even though they do not involve any use of what can technically be called a trade-mark. . . . But the section should be construed to include only such false descriptions or representations as are of substantially the same economic nature as those which involve infringement or other improper use of trade-marks. It should not be interpreted so as to bring within its scope any kind of undesirable business practice which involves deception, when such practices are outside the field of the trade-mark laws . . . ..

*Federal-Mogul-Bower Bearings, Inc. v. Azoff*, 313 F.2d 405, 409 (6 Cir. 1963) *quoting from, Samson Crane Co. v. Union National*

*Sales, Inc.*, 87 F.Supp. 218, 222 (D.Mass.) *aff'd*, 180 F.2d 896 (1 Cir. 1950).

22. In addition to what is said *supra*, we note that the term "false designation of origin" which is employed in § 43(a) has been interpreted to mean any false indication of the source of manufacture and is not limited to geographic origin. *See N.S. Meyer, supra*, 326 F.Supp. at 342; *Geisel, supra*, 283 F. Supp. at 267. Liability under the statute is *not limited to* literal falsehoods, but encompasses representations which create a false impression as well. *Geisel, supra*. In addition, one need not prove actual palming off; a showing of likelihood of customer confusion as to the source of the product is sufficient. *Id. See generally*, 1 R. Callmann, *supra*, § 18.2(b) at 622–24; 2 J. T. McCarthy, *supra*, § 27.7 at 254–55; Germain, *supra*, 64 Trademark Reporter at 205–212.

23. *Compare* Judge Stewart's recent decision concerning the late popular singer Jimi Hendrix, *Hagood v. Springboard Int'l Records, Inc.*, 75 Civ. 34 (S.D.N.Y. June 20, 1975).

Merely stating a § 43(a) claim is, of course, not enough; the pleader must also possess a sufficient nexus with the alleged wrongful conduct in order to satisfy the standing requirement of the statute. However, as the court observed in *L'Aiglon, supra*, § 43(a) envisions "a broad class of suitors" embracing "any person who believes that he is or is likely to be damaged" by the statutorily prohibited conduct. 15 U.S. C. § 1125(a). While the statutory "likely to be damaged" formulation has been interpreted to extend the provisions of the Act "to protect the interests of a purely commercial class against unscrupulous commercial conduct" and not to consumers generally, *Colligan v. Activities Club of New York*, 442 F.2d 686, 692 (2 Cir.), *cert. denied*, 404 U.S. 1004, 92 S.Ct. 559, 30 L.Ed.2d 557 (1972), the cases make it clear that a business competitor, either direct or indirect, who may suffer adverse consequences arising from a violation of § 43(a) has standing to sue. *Alfred Dunhill Ltd., supra*, 499 F.2d at 236; *National Lampoon, supra*, 376 F.Supp. at 746; *Mortellito, supra*, 335 F.Supp. at 1294; 2 J. T. McCarthy, *supra* n. 16, § 27:4 at 245–49; J. Gilson, *supra* n. 16, § 7.02[3] [a] at 7–23—7–25; Germain, *supra* n. 13, 64 Trademark Reporter at 201–05. Moreover, the "broad use of the words 'any person' . . . clearly to reflect a legislative purpose to protect competitive users of trademarks whether or not they are owners of the mark." *D. M. & Antique Import Corp. v. Royal Saxe Corp.*, 311 F.Supp. 1261, 1268 (S.D.N.Y.1970). *Cf., Norman M. Morris Corp. v. Weinstein*, 466 F.2d 137, 142 (5 Cir. 1972). Thus, as Callmann observes, the "dispositive question should be whether [a litigant] has a reasonable interest to be protected against false advertising." 1 R. Callmann, *supra* n. 16, § 18.2(b) at 625. On the facts of this case, it is plain that Hoorelbeke and Urso are competitors of the third-party defendants in the rock music market and that they are "likely to be damaged" by and possess a reasonable interest worthy of protection against false advertising and deceptive practices engaged in by the Bridges faction, if falsity and deception can indeed be established. The first counterclaim-third-party complaint is, therefore, properly before the Court.

## IV

In his treatise, Professor McCarthy observes that "[t]he falsity of [one's] representations is . . . somewhat akin to the defense of 'truth' in defamation cases." 2 J. T. McCarthy, *supra* § 27:7 at 255. While this general proposition accurately reflects the substantive issue presently before the Court, our inquiry assumes a somewhat unusual twist because the question of falsity is resolved exclusively by a predicate finding of stock ownership.

In passing upon the factual issues which are bound up in the Guzman and Folcik controversies, as trier of the facts, we are entitled, indeed obligated, to evaluate and consider the credibility of the witnesses who have appeared and testified. Fed.R.Civ.P. 52(a) ("due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.") As Judge Medina has stated: "issues of credibility, and those arising out of contradictory testimony, other inconsistencies and the general welter of exaggeration, hesitancy and half-truths, even in cases where the testimony is partly or even wholly by deposition, are primarily to be disposed of by the trial judge in a non-jury case . . . ." *M. W. Zack Metal Co. v. S.S. Birmingham City*, 311 F.2d 334, 336–37 (2 Cir. 1962), *cert. denied*, 375 U.S. 816, 84 S.Ct. 50, 11 L.Ed.2d 51 (1963). In this vein, to the extent that the testimony of defendant Hoorelbeke and his attorney-tax planner Alan Rosefielde bear upon the litigated issues of fact, we find it incredible, self-serving and generally suspect because of the strong desire of these individuals to regain control of the corporation. By virtue of the verdict rendered, we believe that the advisory jury, empanelled in this cause and fully

instructed on the methods of judging credibility and in evaluating testimony and demeanor, arrived at a like conclusion. Contrariwise, Bridges and Guzman impressed the Court (and apparently the advisory panel) as sincere, honest and forthright men who had been removed from the business affairs of the Rare Earth group until thrust into a position of corporate management last July and who, prior to that date, exercised no control over the corporate books and records or over corporate affairs in general (unlike Hoorelbeke and Rosefielde).

### FOLCIK

Kenneth Folcik was an original member of the Rare Earth performing group, as well as an incorporator and original director of Rare Earth, Inc. Upon incorporation, he became the lawful owner of 200 shares of the corporation's capital stock. In November, 1970, Folcik departed from the playing group. At issue is whether he subsequently divested himself of shareholder status by means of a transfer of his stock to the corporation. We find that Folcik did and is thus not presently a shareholder of Rare Earth, Inc.

At trial, the parties stipulated:

> [T]hat on February 23, 1971 . . . Ken Folcik received from the corporation a check, which was marked stock and repayment of loan, that at the same time [that] he received that check, which is Plaintiff's Exhibit 7, he executed . . . an indorsement on the back of [his] shares, which are represented by Plaintiff's Exhibit 14, and that as it appears the indorsement is in blank and was executed at or about the same time that he got the check.

(Tr. at 475–76.) It was further stipulated that after indorsing the certificate in blank, Folcik delivered the shares to Henry Baskin, the attorney who then served as counsel to both the corporation and Folcik. (*Id.* at 476.) It is not disputed that Baskin, thereafter, delivered the certificate to Alan Rosefielde, the corporation's tax-advisor, in whose possession the stock remained until the commencement of this litigation.

From these operative facts, the contentions of the parties blossom. The Bridges faction argues that Folcik's indorsement of the certificate in blank and his delivery of the shares to Baskin (and, later, Baskin's delivery to Rosefielde), when read in light of the surrounding circumstantial proof, constituted an effective transfer of ownership to the corporation within the meaning of Article 8 of the Uniform Commercial Code [U.C.C.]. The circumstantial indicia of divestiture are categorized as the notation on the check ("stock & repayment of loan"); the notation on the corresponding check stub ("to Kenny Folcik for closing"); the failure of the corporation to list Folcik as a shareholder on income tax returns subsequent to 1971 (returns prepared by Rosefielde and signed by Hoorelbeke); and the prior inconsistent statements of Hoorelbeke to the effect that he was a 50% shareholder of Rare Earth, Inc.

Contrariwise, the Hoorelbeke group contends that Folcik remains a shareholder because, in their view, the delivery of his shares to Baskin and Rosefielde constituted no more than an escrow arrangement whereby the shares were to be retained pending settlement of the purchase price. It is asserted that the $5,000 check issued to Folcik represented only partial payment for the stock and that Folcik intended to remain a shareholder until his interest was fully valued and full consideration was tendered for his shares. In support of this view, the defendants offered the deposition testimony of Baskin, who in essence testified that he considered Folcik a present shareholder of Rare Earth, Inc. because Folcik had never been fully paid for his stock. Moreover, the defendants assert that neither Baskin nor Rosefielde were proper agents for receipt of the stock on behalf of the corporation. Neither the defendants nor plaintiff produced Folcik for examination at trial.

For the reasons stated below, we find the defendants' position to be a confusion of the applicable law and we conclude that title to Folcik's 200 shares has passed to the corporation.

With regard to the transfer of investment securities, the applicable law is contained in Article 8 of the Michigan U.C.C. *See,* Mich.Comp.Laws Ann. § 450.1471. Under the Code, the indorsement of a certificate may either be special or in blank (Mich.Comp.Laws Ann. § 440.8308),[24] however, an "indorsement of a security whether special or in blank does not constitute a transfer until delivery of the security on which it appears or if the indorsement is on a separate document until delivery of both the document and the security."[25] Mich. Comp.Laws Ann. § 440.8309. In turn, Mich.Comp.Laws Ann. § 440.8313(1)(a) provides that "[d]elivery to a purchaser occurs when . . . he or a person designated by him acquires possession of a security." Delivery with respect to securities "means voluntary transfer of possession", Mich.Comp.Laws Ann. §

440.1201(14), and possession has been equated to "actual physical possession," 3 R. Anderson, *Uniform Commercial Code,* § 8–313:5 at 767 (2 ed. 1971).[26] The Code provisions comport with the antecedent Michigan case law,[27] and as one court has recently summarized, "All that is required to effectuate a valid transfer of securities between the parties to the transfer is delivery with intent to change ownership." *Brener v. Industrial Steel Container Co.,* Minn., 228 N.W.2d 115, 118 (Minn.Sup.Ct. 1975. *See also, Kaufman v. Diversified Industries, Inc.,* 460 F.2d 1331, 1334 (2 Cir.), *cert. denied,* 409 U.S. 1038, 93 S. Ct. 517, 34 L.Ed.2d 487 (1972); *SEC v. John E. Samuel & Co.,* [1972–73 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 93,720 at 93,196, 93,197 (S.D.N.Y.1973); *Morris v. Kaiser,* 292 Ala. 650, 299 So.2d 252 (1974); *Rogers v. Rogers,* 271 Md. 603, 319 A.2d 119, 122–23 (Md.Ct.App. 1974); *McCorquodale v. Holiday, Inc.,* 518 P.2d 1097, 1098 (Nev.Sup.Ct.1974).

▉ With regard to the element of delivery, two separate requisites, both of

---

24. Mich.Comp. Laws Ann. § 440.8308 states, *inter alia:*

 (1) Indorsement; manner of making. An indorsement of a security in registered form is made when an appropriate person signs on it or on a separate document an assignment or transfer of the security or a power to assign or transfer it or when the signature of such person is written without more upon the back of the security.

 (2) Blank or special indorsement. *An indorsement may be in blank or special. An indorsement in blank includes an indorsement to bearer.* A special indorsement specifies the person to whom the security is to be transferred, or who has power to transfer it. A holder may convert a blank indorsement into a special indorsement.

 (3) Appropriate person to indorse. "An appropriate person" in subsection (1) means

 (a) the person specified by the security or by special indorsement to be entitled to the security . . . . .

 [Emphasis added.]

25. An examination of Folcik's share of certificate clearly reveals the existence of an

indorsement in blank which comports with Mich.Comp.Laws Ann. § 440.8308. The genuineness of his signature is not questioned.

26. For a general overview of the transfer of securities mechanism under the Code both in Michigan and other jurisdictions *see,* 7 Michigan Law & Practice Encyclopedia, Corporations §§ 121 and 124 at 102–03 and 107–10; 3 R. Anderson, *supra* at 742–51 and 760–70; 1 R. Anderson, *supra* §§ 1–201:40—1–201:41 at 92–94 (2 ed. 1970); 12 W. Fletcher, *supra* §§ 5482–5486 at 291–303 (rev. 1971); C. Israels & E. Guttman, *Modern Securities Transfers,* §§ 4.01–6.07 at 47–97 (rev. 1971 and Supp. 1974); Comment, *The Status of An Investment Security Holder Under Article 8,* 33 Fordham L.Rev. 466, 479–81 (1965).

27. *See, e. g., Robinson v. Robson,* 297 Mich. 119, 297 N.W. 208 (1941) ("A blank endorsement of a stock certificate empowers the possessor thereof to pass title by delivery to one who is a purchaser within the statute. [Citation omitted.] The title passes to a good-faith purchaser by delivery." 297 N.W. at 213.); *Austin v. Hayden,* 171 Mich. 88, 137 N.W. 317, 322 (1912).

**42**

which the defendants presently dispute, must coalesce: (1) a transfer of actual physical possession of the certificate to the corporation or a person designated by it; and (2) a volitional act by the transferor which manifests an intent to change ownership of the stock.

 We find that the receipt of Folcik's certificate by Baskin and, later, by Rosefielde (a corporate functionary who knew not Folcik) satisfies that aspect of delivery specified by § 440.8313(1)(a) and constitutes an acquisition of actual possession of the stock by an appropriate person on behalf of Rare Earth, Inc. We so conclude for the following reasons. The business affairs of the corporation were conducted in such a fashion as to allow outsiders like Baskin and Rosefielde to exercise their duties and corporate prerogatives with little restraint. The simultaneous issuance of a $5,000 corporate check to Folcik as (at least) partial payment for the stock, the notation which appears in the corporate check book that such check was "for closing" as well as the failure of the corporation to subsequently list Folcik as a shareholder on Rare Earth, Inc. tax returns both individually and collectively evidence that the corporation considered itself to be in receipt of the shares and the owner thereof. The fact that the share certificate was in the possession and control of Rare Earth, Inc. (in the corporate files maintained by Rosefielde) for over three years in a form capable of transfer to a bona fide purchaser further indicates that an actual transfer of physical possession had occurred. As the Michigan courts long ago recognized, "possession of certificates of corporate stock which bear the proper indorsements is *prima facie* evidence of ownership." *Walker v. Detroit Transit R. Co.*, 47 Mich. 338, 11 N.W. 187, 190 (1882). *See, also, Robinson v. Robson*, 297 Mich. 119, 297 N.W. 208 (1941); 7 Michigan Law & Practice Encyclopedia, Corporations § 124 at 108. Here, not only did the corporation have actual possession of the certificate indorsed in blank, but it had also made some payment therefor and had ceased to consider Folcik a shareholder. When all of these facts are considered in conjunction with Folcik's intent at the time of transfer, *infra*, it is plain that a delivery of the shares to Rare Earth, Inc. within the meaning of § 440.8313(1)(a) occurred when the certificate was tendered to Baskin or, at the latest, to Rosefielde. *Compare, Berkeley, Inc. v. Brettler*, 354 Mass. 24, 234 N.E.2d 742 (1968), *with James v. Thurn*, 265 Md. 501, 290 A.2d 490 (Md.Ct.App.1972). *Cf., Katz v. Amos Treat & Co.*, 411 F.2d 1046, 1054–55 n. 7 (2 Cir. 1969).

We further find that the second requisite for the "good delivery" of an investment security—the voluntary parting of control with intent to transfer ownership—was met in this case. Folcik's delivery of his certificate to Baskin was performed with the singular intent of divesting himself of share ownership and receiving payment. This intent was carried forward by Baskin when he transferred the shares to Rosefielde. Baskin states that he tendered the stock to Rosefielde and said "you are instructed that when we arrive at the amount, to just void the certificate or give it to the corporation. . . ." (Tr. at 502). Plainly, Folcik (and Baskin) had voluntarily parted with the certificate with the intent that the corporation assume ownership.

The defendants contend, however, that Folcik "did not intend to voluntarily deliver his shares in Rare Earth to anyone without full consideration" and that because full payment has never been tendered by the corporation a delivery of the stock has not occurred. This position fails both on the law and the facts.

 Under the Code, "legal title to stock passes to the buyer upon delivery of the certificate in proper form." 8 S. Williston, *Law of Contracts* § 953 at 321 (3 ed. Jaeger 1964). *See,* Mich.Comp. Laws Ann. § 440.8301(1); 7 Michigan Law & Practice Encyclopedia, Corporations § 87 at 70 ("Under the provisions

of the Uniform Commercial Code . . . title to a certificate and to the shares represented thereby can be transferred only by delivery of the certificate."). Thus, "Payment of the purchase price is not necessarily essential to the passing of title . . . ." 12A W. Fletcher, *supra* § 5613 at 236 (rev. 1972). This is the law in Michigan, *see, Short v. Hollingsworth,* 291 Mich. 271, 289 N.W. 158 (1939); *Judson v. Stonington Mining Co.,* 128 Mich. 103, 87 N. W. 108 (1901), and elsewhere. *See, e. G., Phillips v. Zimring,* 284 So.2d 233 (Fla.Dist.Ct.App.1973), *cert. denied,* 293 So.2d 359 (Fla.Sup.Ct.1974); *Tracy v. Perkins-Tracy Printing Co.,* 278 Minn. 159, 153 N.W.2d 241 (1967); *Bellows v. McKenzie,* 212 Mass. 601, 99 N.E. 470 (1912); *cf., Hewitt v. Paine, Webber, Jackson & Curtis,* 6 UCC Rep.Serv. 388, 389 (N.Y.Sup.Ct.1969) ("The delay by Paine . . . in concluding the transaction by remitting the proceeds to Craig did not serve to retain title to the securities in Craig.") Moreover, as Williston observes: "If, in the agreement between the parties, the price at which the stock is to be purchased is not stated, the law implies a promise to pay the actual value or its market price. . . ." 8 S. Williston, *supra* § 948 at 129. Thus, once delivery has occurred the seller is divested of title and, if payment is not forthcoming, he acquires a cause of action to recover the outstanding balance of the purchase price or the actual value of the stock. Mich.Comp.Laws Ann. § 440.8107(2). *See, Hayden Stone, Inc. v. Brode,* 508 F.2d 895, 896–97 (7 Cir. 1974); 12A W. Fletcher, *supra* § 5630 at 319–21.

Applying these legal principles to the facts at bar, we find that following his departure from the performing group in November, 1970, Folcik sought to sever his remaining ties with Rare Earth. In February, 1971, he indorsed his certificate in blank and delivered it to Baskin with the intent that the corporation purchase his shares. In turn, the corporation issued a $5,000 check to Folcik, an amount equal to his original contribution to capital. The balance of the purchase price, the total amount of which could not exceed the book value of the shares,[28] remained for future determination.

That a portion of the consideration attributable to the shares remained outstanding at the time of delivery to Baskin, and the latter's subsequent delivery to Rosefielde, does not diminish the legal effect of the delivery itself, because as we have observed, *supra,* payment is irrelevant to the passing of title. Both Folcik and Baskin voluntarily surrendered possession with the intent that the corporation become the owner of the stock. In so doing, legal title passed and Folcik was limited to his right to pursue contractual remedies against the buyer.

We conclude, therefore, that the two requisite elements for a good delivery of an investment security—transfer of physical possession and a voluntary parting of possession with intent to change ownership—concurred with regard to the Folcik shares when the certificate was placed in Baskin's possession, or, at the latest, when Rosefielde acquired dominion and control over the stock. This being so, Folcik is not presently (nor was he at any time here relevant) a shareholder of Rare Earth, Inc. and Hoorelbeke, therefore, cannot serve as voting trustee of his shares.

### GUZMAN

We find that Edward Guzman is the lawful owner of 200 shares of Rare Earth, Inc. stock. Under Michigan law, "An individual claiming to be a stockholder has the burden of proving it by a preponderance of the evidence.

---

28. Article V(3) of the Articles of Incorporation of Rare Earth, Inc. provides, *inter alia,* that "no stockholder shall assign, transfer, sell, dispose of or hypothecate of his or her common stock in this corporation unless and until it is first offered in writing to this corporation at a price not to exceed the then book value thereof . . . ."

. . ." 7 Michigan Law & Practice Encyclopedia, Corporations § 181 at 152. On the basis of the credible evidence contained in the record, we find the facts to be as specified below and conclude therefrom that Guzman has satisfied the requisite burden of proof.

In November, 1969, Edward Guzman became a full-time member of the Rare Earth performing group. (Rare Earth, Inc. did not then exist.) Prior thereto, the band consisted of Bridges, Hoorelbeke, Folcik, Cox and Persh. These five individuals had performed together publicly for several years and during that period had acquired certain equipment and other assets, including the "RARE EARTH" name. As a condition of membership in the band, Guzman was required to contribute $5,000 which was to serve as consideration for his share of the pre-existing group assets. However, in November, 1969, Guzman was not so financially situated as to have access to $5,000 and, therefore, the other band members agreed that payment of this sum could be deferred until Guzman had received royalties from the group's record albums.

In July, 1970, Rare Earth, Inc. was incorporated in Michigan. Each band member, including Guzman, served as an incorporator and subscribed for 200 shares of the corporation's capital stock. Each individual agreed to contribute $5,000 to the corporation upon its formation: $200 for 200 shares of stock and $4,800 as a loan. In addition, the corporation assumed the assets (and liabilities) of the "RARE EARTH" group. Included among such assets was Guzman's $5,000 debt which had not as yet been paid. Thus, upon incorporation, Guzman was indebted to Rare Earth, Inc. in the sum of $10,000: $200 for his stock; $4,800 for his loan to the corporation; and $5,000 for his antecedent debt to the Rare Earth performing group.

Following the completion of the formalities of incorporation, each of the band members received a certificate representing 200 shares of Rare Earth, Inc. (Guzman has maintained either actual or constructive possession of his certificate ever since.) During the next several months (at different times), each of the five original group members tendered payment of their $5,000 contribution to capital. Guzman, who had yet to receive any royalty payments, continued to be indebted to the corporation in the amount of $10,000.

In 1971, three events altered Guzman's position. By the end of March, 1971, both Folcik and Cox had departed from the group and had delivered their shares to the corporation and received a return of their $5,000 capital contribution. In April, 1971, Guzman delivered a $5,000 check to the corporation. (Exhibit 5.) In September, 1971, the corporation issued checks in the amount of $7,530 to Bridges, Hoorelbeke and Persh. This sum was tendered in repayment of the capital contribution of these men to Rare Earth, Inc. (the loans which they had made to the corporation). (See, Exhibit 15.) Guzman did not receive any payment from the corporation at this time.

Under Michigan law: "A certificate of stock is merely evidence of ownership of shares and its issue or possession is not necessary to constitute one a shareholder. One may be a stockholder though he is not so recorded on the books of the corporation." *Gibson v. Oswalt*, 269 Mich. 300, 257 N.W. 825, 828 (1934). *See also, Glass v. Lock*, 286 Mich. 628, 282 N.W. 845, 847 (1938); *Polish American Publishing Co. v. Wojcik*, 280 Mich. 466, 273 N.W. 771, 773 (1937); 7 Michigan Law & Practice Encyclopedia, Corporations § 86 at 71 and § 181 at 151. Thus, the fact that Guzman has always possessed a certificate for 200 shares of Rare Earth stock cannot be considered conclusive on the issue of his share ownership and, likewise, the fact that his shares may not have been properly lodged on the corporate books cannot serve to defeat his claim, if it is otherwise meritorious. Rather, the

question turns upon the actualities of subscription and payment.

Manifestly, Guzman subscribed for 200 shares of Rare Earth, Inc. and did, in fact, receive a certificate for such shares. While the act of subscription alone (without payment) may be sufficient to constitute one as a stockholder under Michigan law,[29] it is unnecessary for Guzman to place reliance upon his status as a subscriber. The defendants' counsel have asserted that one does not attain "any of the rights and privileges of a shareholder until *full* payment is received by the corporation."[30] Accepting *arguendo* the accuracy of this statement, we find that its dictates have been satisfied in the instant case.[31]

---

29. "[A] subscriber for stock has at least some of the rights of a stockholder, from and after the acceptance of his subscription . . . ." *Smith v. General Motors Corp.*, 289 F. 205, 208 (6 Cir. 1923). [I]t is the general rule that an unconditional subscription agreement and promise to take a given number of shares in a corporation whether it is already in existence or is afterward to be formed, when it has been expressly or impliedly accepted or assented to by the corporation so as to be mutually binding, makes the subscriber a full shareholder with respect to that number of shares.) 7 Michigan Law & Practice Encyclopedia, Corporations § 102 at 82, *citing, Leelanau Transit Co. v. Houdek*, 239 Mich. 101, 214 N.W. 142 (1927). *See, C. M. Hall Lamp Co. v. United States*, 201 F.2d 465, 468 (6 Cir. 1953); *Union City Lumber Co. v. Traverse City, L. & M. Ry. Co.*, 170 Mich. 205, 136 N.W. 463, 467 (1912). As Professor Henn states: "the subscriber becomes a shareholder at the time of the making of the subscription; as a shareholder, the subscriber enjoys the rights and is subject to the liabilities of shareholders . . . ." H. Henn, *Law of Corporations* § 169 at 311 (2 ed. 1970). This general principle is subject to modification, either by the terms of the subscription contract (*see Smith v. General Motors, supra*) or by statute. (*See*, Mich.Comp. Laws Ann. § 450.1315.)

In general, payment for shares under a subscription agreement must be made in accordance with the terms of the agreement, and although a subscriber for stock has some rights of a stockholder from the acceptance of his subscription, by express agreement the vesting of these rights may be postponed until full payment without changing the character of the contract as a subscription.

Under terms of the Business Corporation Act, unless otherwise provided in the subscription agreement, a subscription for shares made before or after organization of a corporation, must be paid in full at such time, or in such installments and at such times, as is determined by the board of directors.

 . . . . .

Except where the consideration is future services or payment, when payment of the full consideration for which shares are to be issued is received by the corporation, the subscriber has all the rights and privileges of a holder of such shares, including registration in his name of a certificate representing them; and the shares are considered to be fully paid and nonassessable; where the consideration is future services or payment, rights of the subscriber are determined by the subscription agreement.
7 Michigan Law & Practice Encyclopedia, Corporations § 108 at 94–96. *See generally*, 4 W. Fletcher, *supra* § 1375 at 39–41 (rev. 1965) ("Actual payment is not necessary to make one a stockholder . . . ." *Id.* at 40.) To the extent that shareholder status is gained under Michigan law by virtue of subscription, without actual payment, Guzman became a shareholder upon incorporation. However, we need not definitively determine the nature of the rights thus gained because we find Guzman's subsequent full payment to be dispositive of his claim.

30. Defendants' Post-Trial Memorandum at 38. We do not vouch for the accuracy of this statement by counsel for the reasons which appear in n. 29, *supra*. However, for purposes of this opinion, the correctness of this proposition is of little consequence as the facts sustain our finding of full payment.

31. That Guzman's payment was received by the corporation well after the date of incorporation is of no consequence. The corporation's remedy for such delinquency is by means of a call or assessment. *See*, Mich. Comp. Laws Ann. § 450.27 and § 450.28 (prior law); § 450.1307 and § 450.1308 (present law); 7 Michigan Law & Practice Encyclopedia, Corporations §§ 109–11 at 97–101; 4 W. Fletcher, *supra* §§ 1790–1821. Thus, as the Michigan Supreme Court long ago recognized:

In contracts of subscription for the stock of corporations, time is not of the essence thereof, unless it is expressly provided or necessarily implied. If, however, time was of the essence of this contract, the corporation waived that feature of it by accept-

**46**

As the Michigan law and practice treatise recognizes "when payment of the full consideration for which shares are to be issued is received by the corporation, the subscriber has all the rights and privileges of a holder of such shares, including registration in his name of a certificate representing them; and the shares are considered to be fully paid and nonassessable." 7 Michigan Law & Practice Encyclopedia, Corporations § 84 at 67 and § 108 at 96. This statement facially comports with the statutory dictates of both the former General Corporation Act (which was in effect in 1970 and 1971), Mich.Comp. Laws Ann. §§ 450.5(2) and 450.21,[32] and the present Business Corporation Act, Mich.Comp.Laws Ann. §§ 450.1305, 450.-1306 and 450.1315.[33] *Cf., Gibson v. Oswalt, supra,* 257 N.W. at 828.

Two separate events in the corporate life of Rare Earth, Inc. cause us to con-

ing payment of the full amount after the delay.

*Holliday v. Wright,* 134 Mich. 608, 96 N.W. 949, 950 (1903). *See also,* 11 W. Fletcher supra § 5182 at 325 (rev. 1971) ("In the absence of an express charter or statutory requirement, the stock of a corporation need not be paid in cash at the time of its organization, or within any particular time after its organization, but assessments or calls may be made upon the subscribers, as the money is needed. Nor, in the absence of an express provision to the contrary, is payment necessary to make one a stockholder, with all the rights . . . of a stockholder . . . ." (footnotes omitted)). This is precisely the situation of the present case—the corporation has accepted payment of the full amount as tendered by Guzman.

32. Mich.Comp.Laws Ann. § 450.5(2) states:
2. Upon the filing of the articles in the office of the secretary of state the corporate existence shall begin and those persons who subscribed to shares prior to the filing of the articles, whether by signing the articles or otherwise, or their assigns shall be shareholders in the corporation. Mich.Comp.Laws Ann. § 450.21 provides as follows:
Obligation of shareholders to pay for shares. Shares of capital stock shall be issued only for money, or for other property, real or personal, tangible or intangible, actually conveyed or transferred to the corporation for its use and lawful purposes or in its possession as surplus or for labor or services actually rendered to the corporation.
Every person who subscribes for par value shares or to whom such shares are issued, except as a share dividend, shall be obligated to pay the corporation therefor, in money or other property or labor or services, not less than the par value thereof. Every person who shall subscribe for shares without par value or to whom such shares are issued except as a share dividend shall be obligated to pay the corporation therefor, in money or such

other property or labor or services, such amount of consideration for each share as may have been determined as in this act provided.
Where shares are issued for which promissory notes, drafts or obligations of the purchaser may be given, certificates therefor shall not be delivered until such promissory notes, drafts or obligations are fully paid; no shares shall be issued for future services.
Where shares are issued for any consideration other than cash, the judgment of the board of directors as to the value thereof shall be conclusive unless it shall be shown that the directors acted in bad faith or failed to exercise reasonable care in determining such value.

33. The present Act provides, *inter alia:*
(1) Unless otherwise provided in the subscription agreement:
(a) A subscription for shares made before or after organization of a corporation, shall be paid in full at such time, or in such installments and at such times, as shall be determined by the board.
Mich.Comp.Laws Ann. § 450.1306.
(1) The consideration for the issuance of shares may be paid, in whole or in part, in money or other property, tangible or intangible, or in services performed or to be performed for the corporation or for its benefit or in its organization or reorganization.
(2) Except where the consideration is future services or payment, when payment of the full consideration for which shares are to be issued is received by the corporation, the subscriber has all the rights and privileges of a holder of such shares, including registration in his name of a certificate representing them; and the shares shall be fully paid and nonassessable. Where the consideration is future services or payment, rights of the subscriber shall be determined by the subscription agreement.
Mich.Comp.Laws Ann. § 450.1315.

clude that Guzman has fully paid for his shares and is, therefore, a stockholder.[34] The $5,000 check which Guzman tendered to the Corporation in April, 1971 is well perceived as full payment of that portion of his indebtedness to Rare Earth, Inc. which arose on incorporation: $200 for his stock and $4,800 as a loan; as contrasted with his antecedent obligation to the Rare Earth group. *Cf.*, 4 W. Fletcher, *supra* § 1750 at 535 (rev. 1965). If, however, it is assumed *arguendo* that the April, 1971 check served as payment for his earlier obligation, then the subsequent events of September, 1971 (the corporation's payment of $7,530 to Bridges, Hoorelbeke and Persh) served to discharge the remainder of Guzman's indebtedness to the corporation, including that which was attributable to the subscription contract. We need not select either one or the other of these events as the point at which Guzman's shareholder rights were definitively established. It is enough that we conclude that, at the latest, by the end of September, 1971, Edward Guzman had fully paid for and was the lawful owner of 200 shares of Rare Earth, Inc. stock.

## CONCLUSION

For the reasons which we have expressed *supra*, we find that Edward Guzman is the lawful owner of 200 shares of Rare Earth, Inc. capital stock and that Kenneth Folcik is not a stockholder of that corporation. This being so, we conclude that of the 600 shares of Rare Earth, Inc. stock which are presently outstanding, the Bridges-Guzman faction controls 400 shares and represents a two-thirds majority of all shareholders. Thus, it is possessed of working corporate control, which, of necessity, permits it to determine who may use the "RARE EARTH" name and mark in connection with musical performances, recordings and the like. While its present position of control may well be *de facto* (*see* Point I, *supra*), the Bridges-Guzman faction has not, for that reason, violated § 43(a) of the Lanham Act. *See, e. g.*, 7 Michigan Law & Practice Encyclopedia, Corporations § 256 at 222–23; 2 W. Fletcher, *supra* §§ 383–86 at 218–24.[35] The defendants have failed to establish their federal claim because the third-party defendants have not, in our opinion, engaged in the sort of conduct which could be characterized as a "false designation of origin," or a "false description or representation" of the "RARE EARTH" musical product, nor have they falsely advertised themselves to be "RARE EARTH" without a claim of right. In sum, we conclude that the Bridges-Guzman faction has not misused a "distinguishing characteristic" of "RARE EARTH" or the "RARE EARTH" musical product in an endeavor to confuse the public as to the origin of their performances. The defendants' § 43(a) claim must be dismissed and, in view of the fact that their pendent state law claims are made to turn upon operative averments identical to their federal claim, namely that they, and not the third-party defendants, are lawfully entitled to control the cor-

34. In addition to the existence of full payment, other evidence in this case supports our finding that Guzman is the owner of 200 shares of Rare Earth, Inc. stock. This evidence includes: the articles of incorporation which list him as a subscriber for 200 shares; the corporation's Michigan Franchise Reports for 1971, 1972 and 1973, each of which list 1,200 shares as issued; the Rare Earth, Inc. California Corporation Franchise Tax Return for 1973, which lists Guzman as a 33⅓% shareholder; and the corporation's 1972 and 1973 federal tax returns, which state that Guzman is a 33⅓% stockholder. All of these documents were executed by the defendant Hoorelbeke.

35. "The general rule is that the acts of de facto officers bind the stockholders both in favor of third persons and of the corporation; that the corporation may rely on the acts of its de facto officers as against the opposition of stockholders." 2 W. Fletcher, *supra* § 386 at 222. Moreover, "A corporation may act by means of an officer de facto as fully and effectually, as regards the public and third persons, as by an officer de jure, in all matters within the scope of the corporate business." *Id.* § 383 at 218.

poration, the state law claims must also be dismissed.[36]

In the year which has elapsed since the ill-conceived directors' meeting of Rare Earth, Inc. at Los Angeles, the young musicians who once formed "RARE EARTH" have expended substantial time, effort and funds toward the resolution of the controversy which exists between them. Now, we are at the end of the road, at least insofar as the present litigation is concerned. This is not to suggest that we are entirely convinced that this opinion will stand to quell the raging battle. An appeal of our decision is not unlikely and the nature of our disposition itself leads to the thought that collateral proceedings may be instituted. It is, therefore, not to the substance of our present decision, but rather to the fact that we have been called upon to render a decision in this case, that we address the succeeding paragraph.

As we have recognized *supra*, despite our gnawing reservations, federal subject matter jurisdiction over this controversy exists under the Lanham Act. However, simply because the subject matter competence of the district court is expansive enough to embrace a controversy, this alone is not a sufficient reason for its invocation when another forum is also available. The courts of the several states are fully qualified and competent to adjudicate legal disputes arising under state law. Indeed, in certain areas of the law, the internal affairs of corporations and their shareholders being among these, state courts are far better equipped than federal courts to determine the rights and liabilities of litigants. In the present case, for example, the questions raised could have been presented to the courts of Michigan and this would have resulted in a definitive construction of Michigan law. The parties, however, for various reasons, instead proceeded to trial in this Court. As a result, the interests of judicial economy and fundamental fairness dictated that we pass upon the merits of this dispute. In so doing, we have endeavored to act as a judge of Michigan would have acted with regard to questions of Michigan law. As a *nisi prius* judge, we must exercise the jurisdiction vested in us by Congress, even in those instances where we find its invocation to be unwise. Only in a rare case are we free to exercise our discretion and, thereby, attempt to adjust the contours of our jurisdictional grant to better reflect the true nature of the American judicial system. *Cf., Universal Gypsum of Georgia, Inc. v. American Cyanamid Co.*, 390 F.Supp. 824 (S.D.N.Y. 1975). However, in this age of congested court calendars—"a time when our dockets are burgeoning with matters peculiar to federal courts" (*id.* at 830)— litigants who seek to advance primarily state law claims are well advised to proceed in the state courts and, thereby, permit other litigants, who have no other forum available to them, an opportunity to advance exclusively federal controversies before federal courts. The present, somewhat discursive endeavor is well concluded with the following words of the modern poet and popular singer Bob Dylan:

> . . . goodbye's too good a word, gal
>
> So I'll just say fare thee well
>
> I ain't sayin' you treated me unkind
> You could have done better but I don't mind
>
> You just kinda wasted my precious time
>
> But don't think twice, it's all right [37]

36. The defendants' state law claims are said to arise at common law and under New York statute for: trademark, service mark and trade name infringement (New York General Business Law §§ 360–368–e) McKinney's Consol. Laws, c. 20; dilution of trademark rights (*id.* § 368–d); wrongful payments to an unlicensed artist manager (*id.* § 172); wasting of corporate assets; and invasion of privacy (New York Civil Rights Law §§ 50 and 51) McKinney's Consol. Laws, c. 6.

37. "Don't Think Twice, It's All Right" (copyright 1963 by M. Witmark & Sons) in *Writings and Drawings by Bob Dylan* 40 (1973).

## ORDER

This opinion shall stand as the Court's findings of fact of conclusions of law pursuant to Rule 52(a) of the Fed.R. Civ.P. and, in conformity herewith, it is hereby

Ordered that the Clerk of the Court enter judgment dismissing the complaint without prejudice; and it is hereby further

Ordered that the Clerk of the Court enter judgment dismissing the counterclaims and the third-party complaint with prejudice; and it is hereby further

Ordered that no costs, expenses, disbursements or attorneys fees be taxed or awarded to or against any party in connection with this proceeding.

It is so ordered.